No. 23-60616

# In the
# United States Court of Appeals
# For the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY,
*PETITIONERS,*

V.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN,
ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*RESPONDENTS.*

**OPENING BRIEF OF PETITIONERS STATE OF TEXAS AND THE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division

February 21, 2024

ERIN K. SNODY
Assistant Attorney General
erin.snody@oag.texas.gov

JOHN R. HULME
Assistant Attorney General
john.hulme@oag.texas.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel.: (512) 463-2012
Fax: (512) 320-0911

Counsel for State of Texas and Texas
Commission on Environmental Quality

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to the fourth sentence of Fifth Circuit Rule 28.2.1, petitioners need not furnish a certificate of interested parties as all parties are governmental entities.

*/s/ Erin K. Snody*
Erin K. Snody

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners the State of Texas and the Texas Commission on Environmental Quality respectfully request oral argument. This case involves the interplay between the State and federal government in carrying out their respective roles under the Clean Air Act's (CAA) system of cooperative federalism. Petitioners challenge a final rule of the United States Environmental Protection Agency (EPA) disapproving Texas's State Implementation Plan addressing contingency-measure requirements for two Serious ozone nonattainment areas for the 2008 8-hour ozone national ambient air quality standards. EPA's disapproval subjects the State to potential sanctions and is a precursor to the implementation of a Federal Implementation Plan (FIP) that would impose EPA's policy preferences on Texas and its industries. Accordingly, this matter carries significant consequences for the State and its citizens. Based on the importance of the issues presented and the consequences of the case, Petitioners submit that oral argument is warranted and would aid the Court's decisional process.

# T<small>ABLE OF</small> C<small>ONTENTS</small>

Certificate of Interested Persons ...................................................... i

Statement Regarding Oral Argument ............................................. ii

Table of Authorities ...................................................................... vi

Glossary of Acronyms and Abbreviations ...................................... 1

Record References ........................................................................... 1

Jurisdictional Statement ................................................................. 2

Issues Presented .............................................................................. 3

Introduction ..................................................................................... 3

Statement of the Case ...................................................................... 6

     I.     Statutory Framework .......................................................... 6

          A.     The CAA's system of cooperative federalism requires EPA to set the NAAQS while States establish plans to achieve and maintain them. .......................... 6

          B.     The Act imposes additional SIP requirements for ozone nonattainment areas ................................... 8

     II.     Procedural History ........................................................... 10

          A.     Texas submits SIP revisions to EPA for approval. ................................................................... 11

          B.     EPA proposes to approve the contingency-measure components of Texas's SIP revisions. ........................ 13

          C.     EPA delays final action on Texas's contingency measure submittals following the D.C. Circuit's opinion in *Sierra Club*. .............................................. 14

      D.      EPA shifts course and disapproves Texas's contingency measures............................................. 16

Summary of the Argument.................................................... 18

Standard of Review ............................................................ 20

Argument ......................................................................... 21

    I.     EPA should have approved Texas's contingency measures in accordance with its long-standing policy and controlling Fifth Circuit case law at the time TCEQ developed and submitted its SIP revisions. ........................... 21

        A.      EPA's post-submittal change in interpretation deprived Texas of fair notice of the standards by which its SIP revisions would be judged. .................................. 23

        B.      EPA's disapproval is inconsistent with its past practice of taking no action on SIP submittals for areas that have been subsequently reclassified. ...................... 27

   II.    EPA's disapproval of Texas's contingency measure submittal under the *Sierra Club* standard was arbitrary, unreasonable, and not in accordance with the applicable law............................................................ 30

        A.      EPA erred in applying *Sierra Club* to disapprove Texas's contingency measure submittal in direct conflict with this Court's precedent in *LEAN*. ...................................................................31

        B.      EPA's interpretation of the Act to require "prospective and conditional" contingency measures even after the applicable attainment date has passed is arbitrary and unreasonable.......................... 32

Conclusion ...................................................................... 39

Certificate of Service......................................................... 41

Certificate of Compliance ........................................................................ 42

Certificate of Electronic Compliance ....................................................... 42

**Cases**                                                          **Page(s)**

*Alaska Prof'l Hunters Ass'n v. FAA*,
    177 F.3d 1030 (D.C. Cir. 1999), *abrogated on other grounds by*
    *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ............................... 24

*Bahr v. U.S. EPA*,
    836 F.3d 1218 (9th Cir. 2016) .................................................. 14, 15, 33

*BCCA Appeal Grp. v. U.S. EPA*,
    355 F.3d 817 (5th Cir. 2003) ............................................................. 3, 7

*Calumet Shreveport Ref., L.L.C. v. U.S. EPA*,
    86 F.4th 1121 (5th Cir. 2023) .............................................................. 30

*Cent. Pines Land Co. v. United States*,
    274 F.3d 881 (5th Cir. 2001) ................................................................31

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) ...................................................................... 24, 25

*ExxonMobil Pipeline Co. v. DOT*,
    867 F.3d 564 (5th Cir. 2017) ............................................................... 24

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................ 20

*Gahagan v. US Citizenship & Immigration Servs.*,
    911 F.3d 298 (5th Cir. 2018) ................................................................31

*La. Envtl. Action Network v. U.S. EPA* (*LEAN*),
    382 F.3d 575 (5th Cir. 2004) ........................................................*passim*

*Luminant Generation Co., L.L.C. v. U.S. EPA.*,
    675 F.3d 917 (5th Cir. 2012) ............................................................. 7, 8

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ............................................................................ 21

*Michigan v. U.S. EPA*,
   268 F.3d 1075 (D.C. Cir. 2001) .......................................................... 3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................... 21

*R.J. Reynolds Vapor Co. v. FDA*,
   65 F.4th 182 (5th Cir. 2023) ...................................................... 24, 25

*Sierra Club v. U.S. EPA*,
   21 F.4th 815 (D.C. Cir. 2021) ...........................................*passim*

*Tex. Oil & Gas Ass'n v. U.S. EPA*,
   161 F.3d 923 (5th Cir. 1998) ....................................................... 21

*Texas v. U.S. EPA*,
   690 F.3d 670 (5th Cir. 2012) ....................................................... 8

*Texas v. U.S. EPA*,
   829 F.3d 405 (5th Cir. 2016) ................................................... 3, 7, 8

*Train v. Nat. Res. Def. Council, Inc.*,
   421 U.S. 60 (1975) ...................................................................... 7

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
   985 F.3d 472 (5th Cir. 2021) ....................................................... 21

**Statutes**

42 U.S.C. § 7401(a)(3) .................................................................. 3

42 U.S.C. § 7407(a) ................................................................... 3, 7

42 U.S.C. § 7407(d)(1)(A)(i)-(ii) .................................................. 6

42 U.S.C. § 7409 .......................................................................... 3

42 U.S.C. § 7409(d)(1) ................................................................ 6

42 U.S.C. § 7410(a)(1) ................................................................. 8

42 U.S.C. § 7410(a)(2) .......................................................... 8

42 U.S.C. § 7410(c) .............................................................. 7

42 U.S.C. § 7410(k)(1)-(2) ..................................................... 8

42 U.S.C. § 7410(k)(1)(B) ...................................................... 8

42 U.S.C. § 7410(k)(2) .......................................................... 4

42 U.S.C. § 7410(k)(2)-(3) ..................................................... 8

42 U.S.C. § 7410(k)(3) .......................................................... 8

42 U.S.C. § 7410(l) .............................................................. 8

42 U.S.C. § 7501(2) ............................................................. 6

42 U.S.C. § 7502(c)(1) ................................................. 4, 31, 38

42 U.S.C. § 7502(c)(9) .......................................................... 9

42 U.S.C. § 7511 ................................................................. 9

42 U.S.C. § 7511a ............................................................... 9

42 U.S.C. § 7511a(b)(1) ........................................................ 9

42 U.S.C. § 7511a(c) ........................................................... 11

42 U.S.C. § 7511a(c)(2)(A)-(B) ............................................... 10

42 U.S.C. § 7511a(c)(2)(B) .................................................... 11

42 U.S.C. § 7511a(c)(9) .............................................. 9, 10, 34, 36

42 U.S.C. §§ 7408-7409 ........................................................ 6

5 U.S.C. § 706(2)(A) ........................................................... 20

**Rules & Regulations**

30 Tex. Admin. Code ch. 115 ................................................................. 10

30 Tex. Admin. Code ch. 117 ................................................................. 10

40 C.F.R. § 50.10 .................................................................................. 4

40 C.F.R. § 50.15 .................................................................................. 4

40 C.F.R. § 50.19 .................................................................................. 4

40 C.F.R. § 51.1100(t) ........................................................................... 9

40 C.F.R. § 52.02(a) .............................................................................. 8

40 C.F.R. § 52.2270 ............................................................................. 10

40 C.F.R. Part 50 .................................................................................. 6

**Other Authorities**

*Air Plan Approval; Texas; Reasonable Further Progress Plan for the Dallas-Fort Worth Ozone Nonattainment Area*, 85 Fed. Reg. 64,084 (Oct. 9, 2020) ................................................................. 14, 23

*Air Plan Approval; Texas; Reasonable Further Progress Plan for the Houston-Galveston-Brazoria Ozone Nonattainment Area*, 85 Fed. Reg. 60,928 (Sept. 29, 2020) ................................................ 10, 13

*Air Plan Approval; Texas; Reasonable Further Progress Plan for the Houston-Galveston-Brazoria Ozone Nonattainment Area*, 86 Fed. Reg. 24,717 (May 10, 2021) ................................................................ 14, 15

*Air Plan Disapproval; Texas; Contingency Measures for the Dallas-Fort Worth and Houston-Galveston-Brazoria Ozone Nonattainment Areas*, 88 Fed. Reg. 24,522 (Apr. 21, 2023) ................................ 14, 32

*Air Plan Disapproval; Texas; Contingency Measures for the Dallas-Fort Worth and Houston-Galveston-Brazoria Ozone Nonattainment Areas*, 88 Fed. Reg. 67,957 (Oct. 3, 2023) (Final Rule) ..................................2, 17

*Approval and Promulgation of Air Quality State Implementation Plans (SIP); Louisiana: Substitute Contingency Measures*, 67 Fed. Reg. 60,592 (Sept. 26, 2002)........................................................................ 34

*Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Serious for the 2008 Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 60,926 (Oct. 7, 2022) ...................................................16, 25

*Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Several Areas Classified as Moderate for the 2008 Ozone National Ambient Air Quality Standards*, 84 Fed. Reg. 44,238 (Aug. 23, 2019) ................................................11

*Draft Guidance on the Preparation of State Implementation Plan Provisions That Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter*, 88 Fed. Reg. 17,571 (Mar. 23, 2023)...........................................................25, 37

*Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements*, 80 Fed. Reg. 12,264 (Mar. 6, 2015) ................................................................... 12, 28

*Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Nonattainment Area State Implementation Plan Requirements*, 83 Fed. Reg. 62,998 (Dec. 6, 2018)................................................15

*Part 410—National Primary and Secondary Ambient Air Quality Standards*, 36 Fed. Reg. 8,186 (Apr. 30, 1971) ........................................................ 4

*Revisions to the National Ambient Air Quality Standards for Photochemical Oxidants*, 44 Fed. Reg. 8,202 (Feb. 8, 1979) .................................. 4

*State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990*, 57 Fed. Reg. 13,498 (Apr. 16, 1992) ................................................................. 12, 28, 34, 36

| APA | Administrative Procedure Act, codified at 5 U.S.C. ch. 5 |
|---|---|
| CAA or Act | Clean Air Act, codified at 42 U.S.C. ch. 85 |
| DFW | Dallas-Fort Worth air quality control region |
| EPA | United States Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| Final Rule | EPA's October 3, 2023 final action disapproving revisions to the State of Texas's SIP addressing contingency measures for the HGB and DFW Serious ozone nonattainment areas for the 2008 ozone NAAQS, published at 88 Fed.Reg. 67,957; C.I. 8 |
| HGB | Houston-Galveston-Brazoria air quality control region |
| NAAQS | National Ambient Air Quality Standards |
| RFP | Reasonable Further Progress |
| SIP | State Implementation Plan |
| TCEQ | Texas Commission on Environmental Quality |

## RECORD REFERENCES

In this brief, "C.I." refers to the certified index of record contents that EPA filed on January 11, 2024. *See* Fed. R. App. P. 17(b)(l)(B). Documents are identified by the "Document Number" on the certified index. In accordance with Fifth Circuit Rule 30.2(a), the Texas State Petitioners will file an appendix containing the portions of the record cited in their, the other parties', and any amici's briefs.

1

# JURISDICTIONAL STATEMENT

This is a suit for judicial review of a final action of the United States Environmental Protection Agency entitled *Air Plan Disapproval; Texas; Contingency Measures for the Dallas-Fort Worth and Houston-Galveston-Brazoria Ozone Nonattainment Areas*, 88 Fed. Reg. 67,957 (October 3, 2023) (Final Rule). C.I. 8. This Court has jurisdiction pursuant to 42 U.S.C. § 7607(b)(1) because the Final Rule is a locally or regionally applicable final action of the EPA Administrator and is not "nationally applicable" or "of nationwide scope or effect." Petitioners timely filed their petition for review on December 1, 2023, within 60 days of the date of publication of the Final Rule in the Federal Register.

To the Honorable U.S. Court of Appeals for the Fifth Circuit:

## ISSUES PRESENTED

1. Whether the EPA's disapproval of Texas's SIP revisions addressing contingency measures for the Dallas-Fort Worth and Houston-Galveston-Brazoria Serious ozone nonattainment areas for the 2008 8-hour ozone NAAQS was arbitrary and capricious given EPA's post-submittal change in interpretation of the applicable requirements and prolonged delay in acting on Texas's submittals.

2. Whether EPA acted arbitrarily and capriciously by applying a strictly forward-looking statutory standard to disapprove Texas's contingency measure submittal after the applicable attainment date had passed.

## INTRODUCTION

The Clean Air Act (CAA) is an "experiment in cooperative federalism" that "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Texas v. U.S. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (quoting *Michigan v. U.S. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001)); *BCCA Appeal Grp. v. U.S. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003). Under this statutory framework, the federal government is responsible for establishing National Ambient Air Quality Standards (NAAQS) for certain air pollutants, 42 U.S.C. § 7409, while the States are responsible for developing and implementing plans to enforce and maintain the NAAQS within their borders. *Id.* §§ 7401(a)(3), 7407(a). If an area within a state cannot attain the NAAQS for a particular pollutant,

3

the state must develop a nonattainment plan designed to bring the area within NAAQS. *Id.* § 7502(c)(1).

One of the pollutants for which EPA has established NAAQS is ozone. EPA first set the NAAQS for ozone as a 1-hour standard for photochemical oxidants[1] in 1971. 36 Fed. Reg. 8186 (Apr. 30, 1971). EPA then replaced the primary 1-hour standard with an 8-hour standard in 1997. 40 C.F.R. § 50.10. That standard was revised in 2008, and then again in 2015. *Id.* §§ 50.15, 50.19. This case only concerns one element of Texas's nonattainment plan for the 2008 8-hour ozone NAAQS: contingency measures.

Texas submitted revisions to its State Implementation Plan (SIP) addressing requirements for the Serious classification of two ozone non-attainment areas, Dallas-Fort-Worth (DFW) and Houston-Galveston-Brazoria (HGB), to EPA for approval. SIP revisions of this nature take significant time and agency resources to prepare and submit, often taking several months, if not years, to complete. Here, Texas timely submitted its revisions in May 2020, C.I. 2-4, but EPA did not take final action on the submittals until October 2023, almost two years after it was statutorily obligated to act. *See* 42 U.S.C. § 7410(k)(2) (requiring EPA to act on SIP

---

[1] EPA changed the indicator from photochemical oxidants to ozone ($O_3$) in its 1979 revision to the NAAQS. 44 Fed. Reg. 8202 (Feb. 8, 1979).

revisions within 18 months). By the time EPA finally disapproved Texas's SIP revisions, the applicable attainment date (July 20, 2021) had passed, and the non-attainment areas had already been reclassified, triggering new obligations to submit additional SIP revisions, including contingency measures. As a result of EPA's delay, Texas is now in the precarious position of not only having to identify forward-looking contingency measures for a past attainment period, but also additional contingency measures for the areas' new classification status. If Texas cannot accomplish this seemingly impossible task, it will be subject to sanctions and potentially EPA's imposition of a Federal Implementation Plan (FIP).

EPA's disapproval of Texas's contingency measures SIP revisions violates a fundamental principle of administrative law: that agencies must give regulated parties fair notice of the standards by which their conduct will be judged. EPA failed to do so here. Its disapproval of Texas's contingency measures relied on a change in standards articulated nearly a year *after* Texas's SIP revisions were statutorily due and submitted. And, more importantly, EPA applied an interpretation of the Clean Air Act's contingency-measures provision that directly conflicts with prior precedent in this Circuit. That interpretation was also unreasonable under the particular circumstances of this case and imposes requirements on the State that are a practical impossibility—States can no longer develop truly "contingent" measures

once the attainment date has passed. Because EPA's Final Rule disapproving Texas's continency measure SIP revisions violates principles of fair notice and adheres to an untenable interpretation of the Act, it is unlawful and should be set aside.

STATEMENT OF THE CASE

## I.  Statutory Framework

### A.  The CAA's system of cooperative federalism requires EPA to set the NAAQS while States establish plans to achieve and maintain them.

The CAA tasks the EPA with identifying and establishing maximum concentrations of certain air pollutants that are harmful to public health and welfare. 42 U.S.C. §§ 7408-7409. EPA has established these standards, known as the NAAQS, for a number of criteria pollutants, including ozone. 40 C.F.R. Part 50. To ensure that the NAAQS remain protective of public health and welfare, EPA must review the NAAQS every five years and revise each standard as appropriate. 42 U.S.C. § 7409(d)(1). Areas that meet the NAAQS for a certain pollutant are called "attainment" areas, while areas that exceed the NAAQS are called "nonattainment" areas. *Id.* § 7407(d)(1)(A)(i)-(ii); *see id.* § 7501(2).

Although EPA is responsible for establishing the NAAQS, the States have primary responsibility for determining how to achieve and maintain the NAAQS

within their borders. *Luminant Generation Co., L.L.C. v. U.S. EPA.*, 675 F.3d 917, 921 (5th Cir. 2012). The CAA requires each state to submit to EPA a SIP that specifies how that state will implement, maintain, and enforce the NAAQS within each air quality control region in the state. 42 U.S.C. §§ 7407(a), 7410(c). "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Texas v. U.S. EPA*, 829 F.3d at 411 (quoting *Luminant*, 675 F.3d at 921). It "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id.*

States have wide discretion in formulating their SIPs. *Luminant*, 675 F.3d at 921. "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Id.* (quoting *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)). While the CAA and EPA provide the goals and basic requirements of SIPs, the States exercise "broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Grp.*, 355 F.3d at 822. Consistent with this preference for state implementation and enforcement, the CAA "confines EPA's role in implementing air quality standards 'to the ministerial

function of reviewing SIPs for consistency with the Act's requirements.'" *Texas v. U.S. EPA*, 829 F.3d at 411 (quoting *Luminant*, 675 F.3d at 921); 42 U.S.C. § 7410(a)(1), (*l*). If a SIP meets the statutory requirements, "EPA must approve it." *Texas v. U.S. EPA*, 690 F.3d 670, 676 (5th Cir. 2012); *see* 42 U.S.C. § 7410(k)(3) ("the Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of this chapter" (emphasis added)); 40 C.F.R. § 52.02(a).

The CAA requires EPA to act on SIP revisions within 18 months of submission. 42 U.S.C. § 7410(k)(1)-(2). EPA must determine, within the first six months, whether a SIP revision is technically and administratively complete. *Id.* § 7410(k)(1)(B). Once a completeness finding has been issued, EPA then has 12 months to approve or deny the SIP or SIP revision. *Id.* § 7410(k)(2)-(3).

## B. The Act imposes additional SIP requirements for ozone nonattainment areas.

The CAA outlines several substantive requirements that must be included in each state's SIP. 42 U.S.C. § 7410(a)(2). For areas that have failed to meet the NAAQS (nonattainment areas), the Act imposes certain additional requirements that must be included in the SIP's nonattainment plan, including provisions for the implementation of contingency measures that will take effect, without any further

action from the State, in the event the area fails to make reasonable further progress (RFP)[2] or to attain the NAAQS by the applicable attainment date. *Id.* § 7502(c)(9).

In additional to the general nonattainment plan, the Act imposes additional SIP requirements specifically for "ozone nonattainment areas." *Id.* § 7511a. Each ozone nonattainment area is assigned a classification level—ranging from Marginal to Extreme—based on how significantly the area exceeds the applicable ozone NAAQS. *Id.* § 7511. Each classification level triggers different requirements for revisions to the SIP. *Id.* § 7511a. Areas classified as Moderate or above must demonstrate, among other things, that RFP will be achieved by reducing emissions of ozone precursors, including nitrogen oxides ($NO_X$) and volatile organic compounds (VOC). *See id.* § 7511a(b)(1).

For areas with a "Serious" ozone nonattainment designation, the SIP revision must also include, among other things, provisions "for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone."[3] *Id.* § 7511a(c)(9). These contingency measures must be designed "to

---

[2] EPA interprets RFP under CAA section 172(c)(2) to be an average of 3 percent per year emissions reduction of either volatile organic compounds (VOC) or nitrogen oxides ($NO_X$). 40 C.F.R. § 51.1100(t).

[3] The 1990 amendments to the CAA left the subpart 1 contingency-measure requirement (section 172(c)(9), relating to nonattainment plans in general) in place, while repeating the contingency-measure requirement in the new subpart 2 (section 182(c)(9), relating to nonattainment plans for Serious ozone nonattainment areas). 42 U.S.C. § 7511a(c)(9).

take effect without further action by the State or the Administrator" upon the State's failure to meet the applicable milestone. *Id.* Applicable milestones include both failure to meet RFP and failure to attain the NAAQS. *See id.* § 7511a(c)(2)(A)-(B). EPA has interpreted the contingency-measures provision "to allow states to rely on measures already in place and implemented so long as those reductions are beyond those relied on for purposes of the attainment or RFP planning SIP." 85 Fed. Reg. 60928, 60931 (Sept. 29, 2020). That interpretation was affirmed by this Court in 2004 as consistent with the CAA. *La. Envtl. Action Network v. U.S. EPA*, 382 F.3d 575, 584 (5th Cir. 2004) *(LEAN)* ("[E]arly activation of continuing contingency measures is consistent with the purpose and requirements of the CAA statute.").

## II.    Procedural History

The Texas Commission on Environmental Quality (TCEQ) regulates and enforces air-quality standards in Texas pursuant to its EPA-approved SIP. 40 C.F.R. § 52.2270. Texas's SIP includes statewide rules designed to achieve and maintain the 2008 ozone NAAQS. *Id.* It also includes area-specific provisions for various ozone-nonattainment areas, including the Houston (HGB) and Dallas (DFW) areas. *Id.*; *see also* 30 Tex. Admin. Code chs. 115, 117. In August 2019, EPA published the final reclassification of both the HGB and DFW areas to Serious ozone non-attainment areas for the 2008 8-hour ozone NAAQS. *Determinations of Attainment*

*by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Several Areas Classified as Moderate for the 2008 Ozone National Ambient Air Quality Standards*, 84 Fed. Reg. 44238 (Aug. 23, 2019). This reclassification triggered Texas's obligation to submit SIP revisions addressing ozone non-attainment requirements for the Serious classification. 42 U.S.C. § 7511a(c). EPA set a deadline of August 3, 2020, for Texas to submit its SIP revisions. 84 Fed. Reg. at 44,245.

## A. Texas submits SIP revisions to EPA for approval.

This case concerns the portion of Texas's SIP revisions addressing contingency-measure requirements.[4] The revisions were required, among other things, to demonstrate $NO_X$ and/or VOC emissions reductions of at least an average of 3 percent per year for the calendar years 2018, 2019, and 2020 for a total of 9 percent and an additional 3 percent for contingency measures in 2021, should the areas fail to meet RFP or fail to attain the 2008 ozone NAAQS by the July 20, 2021 attainment date. C.I. 4 at ES-2; 42 U.S.C. § 7511a(c)(2)(B). According to EPA guidance and prior precedent, the additional 3-percent emissions reductions for contingency measures could be achieved through measures that had already been implemented but would achieve surplus or additional emissions reductions beyond those relied upon for the RFP or attainment demonstrations. *Implementation of the*

---

[4] In 2008, EPA revised the 8-hour ozone primary and secondary NAAQS to a level of 0.075 parts per million (ppm). 40 C.F.R. § 50.15.

*2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements*, 80 Fed. Reg. 12264, 12285 (Mar. 6, 2015) ("EPA proposed continuing its long-standing policy that allows promulgated federal measures to be used as contingency measures as long as they provide emission reductions in the relevant years in excess of those needed for attainment or RFP."); *see also LEAN*, 382 F.3d at 584; *State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990*, 57 Fed. Reg. 13498, 13,511 (Apr. 16, 1992).

Texas timely submitted its SIP revisions to EPA for approval on May 12, 2020.[5] C.I. 2; C.I. 3; C.I. 4. In the submittal, TCEQ included contingency measures consisting primarily of surplus emissions reductions from control measures that were already in place, including projected emissions reductions from federal vehicle and engine emissions certification programs and from fuel control programs for both on-road and non-road vehicles. C.I. 2 at 4-12; C.I. 3 at 4-14; C.I. 4 at 4-13 – 4-15. These emissions reductions were entirely surplus, meaning that they were additional reductions that would occur on top of the emissions reductions relied upon to demonstrate RFP or attainment. *Id*. In other words, these emissions reductions were

---

[5] Texas SIP revisions for the HGB and DFW Serious classification consist of three separate filings: (1) the Attainment Demonstration for the HGB nonattainment area, C.I. 2; (2) the Attainment Demonstration for the DFW nonattainment area, C.I. 3; and (3) the Reasonable Further Progress demonstration for both the HGB and DFW nonattainment areas, C.I. 4. For ease of reading, Petitioners refer to these filings collectively as Texas's SIP revisions or the submittal for the Serious classification.

not used to achieve the annual 3% emissions reductions necessary to demonstrate RFP or attainment, they were excess or additional emissions reductions. Texas projected that the identified emissions reductions would be achieved between January 1, 2021, through December 31, 2021, the one-year period following the 2020 attainment year. *Id.* And while only 3% emissions reductions were required to fulfill the contingency-measure requirement, Texas projected that its measures would actually exceed that amount in both the DFW and HGB areas.[6] C.I. 2 at 4-12; C.I. 3 at 4-14.

### B. EPA proposes to approve the contingency-measure components of Texas's SIP revisions.

On September 29, 2020, and October 9, 2020, EPA published proposed approvals of the contingency-measure elements of Texas's May 2020 SIP revisions for the HGB and DFW areas, respectively. *Air Plan Approval; Texas; Reasonable Further Progress Plan for the Houston-Galveston-Brazoria Ozone Nonattainment Area*, 85 Fed. Reg. 60928 (Sept. 29, 2020); *Air Plan Approval; Texas; Reasonable Further Progress Plan for the Dallas-Fort Worth Ozone Nonattainment Area*, 85 Fed. Reg.

---

[6] For the HGB nonattainment area, Texas needed to demonstrate a reduction of 13.29 tons per day of NOx to satisfy the required 3% emissions reduction for contingency measures. C.I. 2 at 4-12. Texas projected its measures would result in a reduction 28.78 tons per day of NOx and 15.34 tons per day of VOC. *Id.* For the DFW nonattainment area, Texas needed to demonstrate a reduction of 8.44 tons per day of NOx and 4.65 tons per day of VOC to satisfy the required 3% emissions reduction for contingency measures. C.I. 3 at 4-14. Texas projected its measures would result in a reduction 27.44 tons per day of NOx and 11.60 tons per day of VOC. *Id.*

64084 (Oct. 9, 2020). In both notices, EPA expressly acknowledged that Texas's contingency measures were consistent with the Act, as interpreted by the Fifth Circuit in *LEAN*, and proposed approval on that basis. 85 Fed. Reg. 60931; 85 Fed. Reg. 64087. EPA received no comments on the proposed approval for the HGB contingency measures. *Air Plan Approval; Texas; Reasonable Further Progress Plan for the Houston-Galveston-Brazoria Ozone Nonattainment Area*, 86 Fed. Reg. 24717 (May 10, 2021). EPA did, however, receive a comment from the Sierra Club on the DFW proposal suggesting that approval of the measures would be inconsistent with a 2016 decision by the Ninth Circuit (*Bahr v. U.S. EPA*, 836 F.3d 1218, 1235-37 (9th Cir. 2016)) in which the court held that contingency measures under section 172(c)(2) of the Act (relating to nonattainment plans in general) must be measures that would only take effect at the time an area fails to meet RFP or fails to attain, but not before. *Air Plan Disapproval; Texas; Contingency Measures for the Dallas-Fort Worth and Houston-Galveston-Brazoria Ozone Nonattainment Areas*, 88 Fed. Reg. 24522 (Apr. 21, 2023); C.I. 1.

### C.    EPA delays final action on Texas's contingency measure submittals following the D.C. Circuit's opinion in *Sierra Club*.

On January 29, 2021—after the comment periods on EPA's proposed approvals of the DFW and HGB contingency measures had closed but before EPA finalized its approval—the D.C. Circuit issued its opinion in *Sierra Club v. U.S. EPA*,

21 F.4th 815 (D.C. Cir. 2021). That case involved a challenge to EPA's 2015 ozone NAAQS implementation rules, in which EPA expressed in the preamble that it intended to continue its long-standing policy of allowing States to rely on surplus and continuing emissions reductions from already-implemented control measures to satisfy the Act's contingency-measure requirement.[7] *Id.* Ultimately, the D.C. Circuit rejected EPA's long-standing interpretation, as confirmed by the Fifth Circuit in *LEAN*, and instead agreed with the Ninth Circuit's holding in *Bahr* that contingency measures must take effect upon the failure to meet RFP or failure to attain, but not before. *Id.* at 828. Shortly thereafter, on May 10, 2021, EPA announced that it would delay action on the contingency-measure elements of Texas's SIP revisions pending further review of the measures in light of the *Sierra Club* opinion. 86 Fed. Reg 24717 (May 10, 2021).

EPA waited nearly two more years before taking any action on Texas's contingency measure submittal. C.I. 1 (proposed disapproval dated April 21, 2023). During that time, the attainment date for the HGB and DFW areas' Serious classification passed and both areas were reclassified as Severe ozone nonattainment

---

[7] In the preamble discussion, EPA acknowledged the Ninth Circuit's opinion in *Bahr* but declined to adopt that interpretation of the Act nationwide. *Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Nonattainment Area State Implementation Plan Requirements*, 83 Fed. Reg. 62,998, 63,026 (Dec. 6, 2018). Instead, EPA announced that it would apply *Bahr* only in the Ninth Circuit and would continue to apply its long-standing interpretation, as affirmed by the Fifth Circuit in *LEAN*, in all other jurisdictions. *Id.*

areas for the 2008 8-hour NAAQS effective November 7, 2022. *Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Serious for the 2008 Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 60926 (Oct. 7, 2022).

**D.    EPA shifts course and disapproves Texas's contingency measures.**

On April 21, 2023, nearly three years after Texas first submitted its SIP revisions, EPA published a proposed rule disapproving both the HGB and DFW contingency measures. C.I. 1. Relying solely on the D.C. Circuit's opinion in *Sierra Club,* EPA explained that Texas's contingency measures did not satisfy the new standard that contingency measures be "prospective and conditional, *i.e.*, measures that would take effect in the event the area fails to make RFP or attain by the applicable attainment date, not before." *Id*. at 24,524. Because Texas's contingency measures—which were submitted prior to the *Sierra Club* decision—relied primarily on surplus emissions reductions from already-implemented measures, EPA rejected them. *Id.*

TCEQ submitted comments on the proposed disapproval on May 22, 2023. C.I. 7. TCEQ commented, among other things, that EPA should have finalized action on the contingency measure portions of Texas's SIP submittals based on the established requirements and statutory interpretation articulated at the time the SIP

revisions were due and submitted to EPA in 2020. *Id*. at 3. TCEQ also noted that EPA's disapproval in this case would be inconsistent with its prior precedent of taking no action on SIP submittals for nonattainment areas that had already been reclassified, *id*. at 1, and that it would be "unreasonable to expect Texas to retroactively address requirements intended to be implemented for a 2021 contingency year" when the areas had already been reclassified. *Id*. at 3.

On October 3, 2023, EPA published its Final Rule disapproving the HGB and DFW contingency-measure elements of Texas's SIP revisions. 88 Fed. Reg. 67957 (Oct. 3, 2023); C.I. 8. In the Final Rule, EPA affirmed its disapproval of Texas's contingency measures based on the prospective-and-conditional requirement announced in *Sierra Club*. C.I. 8 at 67,958 (EPA "now agrees that the plain language of section 172(c)(9) and section 182(c)(9) require that contingency measures be both conditional and prospective."). EPA also dismissed TCEQ's concerns about implementing contingency measures for a past attainment deadline and directed Texas to "submit plans for each area containing prospective and conditional contingency measures." C.I. 8 at 67,961. If these measures are not submitted and approved by EPA by May 3, 2025, Texas will be subject to the offset sanctions in CAA section 179(b)(2). *Id*. Then, if EPA has not approved new measures within six months after the offset sanctions, Texas will also be subject to the highway funding

sanction in CAA section 179(b)(1)—which prohibits the Federal Highway Administration from approving certain projects or awarding grants in the nonattainment areas—and, eventually, imposition of a FIP. *Id.*

On December 1, 2023, Texas timely petitioned this Court for review.

## SUMMARY OF THE ARGUMENT

EPA should have approved Texas's SIP revisions under its long-standing policy of allowing contingency measures that achieve continuing and surplus emissions reductions through emissions-control methods that are already in place. This interpretation of the Act was affirmed by this Court and was unquestionably the controlling legal standard for Texas at the time its SIP revisions were due and submitted to EPA. Notwithstanding the D.C. Circuit's subsequent decision in *Sierra Club*, EPA's prior policy remains an appropriate way to interpret and apply the Act to Texas's submittal in this case, especially given the timeline of events and the consequences of EPA's actions.

Indeed, EPA initially agreed that Texas's contingency measures satisfied the Act and even published notice of its intent to approve them. Yet, after the comment period on the proposed approval had closed, EPA shifted course—based solely on an intervening decision of the D.C. Circuit—and instead disapproved Texas's SIP revisions. Not only did EPA's change in interpretation of the applicable

18

requirements occur *after* Texas had already submitted its revisions, thereby ensuring that Texas's submittal would fail, but EPA did not even propose its disapproval until after the attainment date had passed and the areas had already been reclassified. This left Texas in the precarious position of having to develop and re-submit "contingency" measures for an attainment date that passed years ago—a practical impossibility—while simultaneously developing new SIP revisions, including separate contingency measures, for the updated classification.

EPA's actions in this case violate a fundamental principle of administrative law: that agencies must give parties fair notice of the standards by which their conduct will be judged. EPA changed the standard by which Texas's contingency measure submittals would be judged while the unapproved revisions remained pending before the agency. Then, EPA declined to take any action on the submittals for nearly two years, leaving Texas guessing as to what EPA intended to do and how Texas should proceed. While Texas was left waiting, the attainment date—one of the milestones that triggers implementation of the contingency measures—passed in July 2021. Once the attainment date passed, it became impossible for any contingency measure submittal to truly be "prospective" and "conditional" as contemplated by *Sierra Club*. Thus, not only did EPA hold Texas to a standard that had not been articulated by the agency at the time its contingency measures were

submitted, but it was also a standard that could no longer be met by the time EPA finally took action.

Now, EPA expects Texas to submit prospective and conditional "contingency" measures (to be implemented immediately) for the superseded Serious classification, in addition to revising its SIP for the updated Severe classification, all while facing fast-approaching sanctions and FIP deadlines. EPA's compounded actions in this case deprived Texas of fair notice of the applicable standards, applied the wrong legal standard, and imposed standards on Texas that are impracticable, if not impossible, to meet. Accordingly, EPA's disapproval of Texas's contingency measures was arbitrary, unreasonable, and an abuse of discretion, and the Final Rule should be vacated.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") empowers this Court to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency action is arbitrary and capricious "'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Tex. Oil & Gas Ass'n v. U.S. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Put simply, [the Court] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

A<small>RGUMENT</small>

I.     **EPA should have approved Texas's contingency measures in accordance with its long-standing policy and controlling Fifth Circuit case law at the time TCEQ developed and submitted its SIP revisions.**

EPA disapproved Texas's contingency measures based solely on a post-submittal change in interpretation of the applicable requirements. And even though the *Sierra Club* decision—the impetus behind EPA's change in interpretation—was issued in 2021, EPA inexplicably waited two more years before finally disapproving Texas's submittal. As a result, EPA's disapproval did not come until *after* the applicable attainment date had passed and the nonattainment areas had already been reclassified.

EPA should have approved Texas's SIP revisions based on its long-standing policy of allowing States to rely on surplus future emissions reductions from measures that are already in place to satisfy the Act's contingency measure requirements. That policy reflected the controlling legal standard at the time Texas's SIP revisions were due and submitted, and it remains an appropriate standard by which to judge Texas's submittal under this Circuit's law— notwithstanding the D.C. Circuit's recent opinion in *Sierra Club*. But even if EPA did not affirmatively approve Texas's contingency measures, it should have simply taken no action on the submittal once the HGB and DFW areas were reclassified as Severe, as it had done in the past.

EPA's actions deprived Texas of fair notice in two respects: (1) Texas had no notice of the standard by which EPA would ultimately judge its contingency measure submittal; and (2) EPA departed, without notice, from its past practice of taking no action on SIP revisions for prior classifications once the areas have been reclassified. Because Texas was deprived of fair notice as to how its SIP submittals would be treated, EPA's disapproval of Texas's contingency measures was arbitrary, unreasonable, and an abuse of discretion.

**A.** **EPA's post-submittal change in interpretation deprived Texas of fair notice of the standards by which its SIP revisions would be judged.**

Texas timely submitted its SIP revisions to EPA on May 12, 2020, as required by the Act upon reclassification of the HGB and DFW areas from Moderate to Serious. C.I. 2 at 1; C.I. at 1; C.I. 4 at 1. The submittal included contingency measures that relied on surplus future emissions reductions from control measures that were already in place. C.I. 2 at 4-12; C.I. 3 at 4-14; C.I. 4 at 4-14 – 4-15. At the time Texas submitted the revisions, EPA had long-since interpreted the Act to allow such measures to satisfy the contingency-measure component of the SIP requirements. 85 Fed. Reg. at 60,931. This interpretation was affirmed by this Court in 2004 and was unquestionably the controlling legal standard when Texas submitted its SIP revisions. *LEAN*, 382 F.3d at 584. Texas relied on this interpretation and EPA's past precedent of approving surplus emissions reductions from already-implemented measures when preparing its Serious SIP revisions, a process that can take several months and significant agency resources to complete.

Consistent with this policy and Fifth Circuit precedent, EPA initially proposed to approve Texas's contingency measures for both the DFW and HGB areas. 85 Fed. Reg. 60928; 85 Fed. Reg. 64084. It wasn't until well after Texas had completed the lengthy process of preparing and submitting its SIP revisions; after

EPA had proposed to approve those revisions; and after the comment periods on the proposed approvals had closed, that EPA changed its position in reliance on the intervening D.C. Circuit opinion in *Sierra Club*. At that point, Texas had already complied with its statutory obligation to submit SIP revisions that satisfied the requirements of the Act—as articulated by EPA and affirmed by this Court—and there was no opportunity for Texas to address EPA's subsequent change in interpretation. This is a classic case of "unfair surprise" that penalizes Texas for its good-faith reliance on EPA's prior positions, not to mention the binding law of this Circuit. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156–57 (2012); *see also ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 579-80 (5th Cir. 2017).

Administrative agencies must give regulated parties fair notice of the standards by which their conduct will be evaluated. *See Christopher*, 567 U.S. at 156–57. As this Court has observed, "[d]ealing with administrative agencies is all too often a complicated and expensive game, and players like [Texas] "are entitled to know the rules." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)). To keep things fair, agencies must give parties notice of what is required and "cannot 'surprise' a party by penalizing it for 'good-faith reliance' on the agency's prior

positions." *Id.* (quoting *Christopher*, 567 U.S. at 156–57). Here, EPA failed to provide Texas with fair notice of the standards by which its contingency measure submittal would be judged.

To make matters worse, EPA chose to delay action—without any indication or instruction to Texas as to what it might require—for over two years after the *Sierra Club* decision.[8] This delay was not insignificant, nor was it harmless. While EPA sat on Texas's SIP revisions, two key events occurred: (1) the attainment date for the areas' Serious classification passed on July 20, 2021; and (2) the areas were reclassified from Serious to Severe effective November 7, 2022. 87 Fed. Reg. at 60,926. Now, EPA has tasked Texas with the seemingly impossible task of having to identify feasible and immediately deployable "contingency" measures for the superseded Serious classification, while simultaneously identifying and proposing additional contingency measures for the new Severe classification.

When Texas raised concerns about the impracticability of developing and implementing contingency measures post-attainment date, EPA summarily dismissed those concerns and refused to provide any practical guidance for real-

---

[8] EPA did not take any action, either through APA rulemaking or the issuance of agency guidance, to officially bring its interpretation of the Act in line with the *Sierra Club* decision until over two years after the opinion was issued. *See Draft Guidance on the Preparation of State Implementation Plan Provisions That Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter*, 88 Fed. Reg. 17571 (Mar. 23, 2023) (providing notice of draft, but not final, agency guidance).

world implementation of such measures. C.I. 8 at 67,960. Instead, EPA merely noted—while acknowledging that Texas submitted its SIP revisions *before* EPA changed its long-standing policy in reliance upon the D.C. Circuit's intervening decision in *Sierra Club*—that "if Texas had developed approvable contingency measures any time before EPA's October 2022 determination that the areas failed to attain, those measures could have been implemented timely." *Id.* at 67,961. Yet, it was EPA's own delay in taking final action on Texas's contingency measures that allowed the attainment and reclassification dates to pass. This delay, coupled with EPA's refusal to provide any guidance as to how it intended to address *Sierra Club* in the Fifth Circuit given this Court's binding precedent in *LEAN*, left Texas guessing as to what EPA might consider to be "approvable contingency measures" in this Circuit.

EPA should have finalized approval of Texas's contingency measures based on its existing policy at the time TCEQ submitted its SIP revisions—a policy that was, and is still, reflective of the law in this Circuit. *LEAN*, 382 F.3d at 584. Instead, EPA chose to delay action on Texas's contingency measures mere months before the July 2021 attainment date, leaving Texas without any indication of what the agency might ultimately require. Now, sanctions and FIP clocks are running, and EPA expects Texas so fulfill the difficult, if not unattainable, task of developing new

"contingency" measures that are both prospective and conditional years after the applicable attainment deadline. EPA's post-submittal change in standards coupled with its decision to unreasonably delay action on Texas's submittal was an abuse of agency discretion that prejudiced Texas's ability to achieve practical and meaningful compliance with the Act.

### B. EPA's disapproval is inconsistent with its past practice of taking no action on SIP submittals for areas that have been subsequently reclassified.

EPA's actions here are particularly unreasonable when viewed in light of its departure from past practice of taking no action on Texas's SIP submittals for areas that have been subsequently reclassified. Even if EPA did not approve Texas's contingency measures, it should have simply taken no action on the submittal once the areas were reclassified.

In the past, where Texas has submitted SIP revisions for ozone nonattainment areas that were subsequently reclassified (*i.e.,* the areas were assigned a new classification status before EPA had finalized action on the SIP revisions for the prior classification), EPA has not taken any action on the pending revisions. C.I. 9. Instead, EPA acknowledged that reclassification triggered the obligation to submit new SIP revisions for the updated classification and considered the previous SIP revisions to be moot. *Id.* ("Because the State will need to submit Serious area Attainment

Demonstration SIPs for the 2008 ozone standard, the 3 Texas Moderate Area Ozone SIPs are considered moot."). As a result, EPA sent the submittals back to the State and closed the docket. *Id.* ("[EPA's] database was updated to show these SIPs as being 'sent back' to the State.").

When TCEQ raised this past practice, EPA shifted course and disavowed its prior actions, claiming that mooting the contingency measure element of the prior SIP submittal would be illogical and "would lead to absurd results." C.I. 8 at 67,958. But contrary to EPA's new position, its prior practices were consistent with the nature and purpose of the Act's contingency-measure provisions. As EPA explained in its rulemaking implementing the 2008 ozone NAAQS, "contingency measures should represent 1-year's worth of progress, amounting to reductions of 3 percent of the baseline emissions inventory for the nonattainment area, *which would be achieved while the state is revising its plans* for the area." 80 Fed. Reg. at 12,285 (emphasis added). The purpose of contingency measures is to provide continuing and additional emissions reductions upon failure of an area to obtain an applicable milestone pending the development of new measures to address the deficiencies. *See* 57 Fed. Reg. at 13,511 ("[T]he contingency measures would be implemented while the State developed and adopted the new measures associated with the [updated] classification.").

Once the areas have been reclassified, as is the case here, the State begins the process of developing new SIP revisions to address the deficiencies under the new classification. And, in this case, Texas already had measures in place during the 2021 contingency year (per its May 2020 SIP revisions) that were designed to achieve the required 3% emissions reduction. C.I. 2 at 4-12; C.I. 3 at 4-14. Those measures continue to remain in place today. The only issue is that those measures were deemed—two years after the fact—to be "unapprovable" by EPA simply because they utilized surplus emissions reductions from control measures that were already in place. C.I. 8 at 67,961. EPA's assertion that Texas must now implement additional contingency measures more than three years after the 2021 contingency year for which the measures were originally submitted—while simultaneously developing SIP revisions for the updated Severe classification—is inconsistent with the nature and purpose of contingency measures.

EPA's compounded actions in this case—first changing the standard by which Texas's submittal was judged long after Texas's SIP revisions were due and submitted; then delaying final action on the submittal until after the attainment date passed and reclassification had occurred; and then, finally, departing from its past precedent of taking no action on SIP revisions for reclassified areas—left Texas guessing at every step. Agencies cannot change their standards mid-process, with no

notice or instruction to the parties, and expect the parties to guess at how best to comply with the agency's unarticulated expectations. *See Calumet Shreveport Ref., L.L.C. v. U.S. EPA*, 86 F.4th 1121, 1135 (5th Cir. 2023). Because Texas was deprived of fair notice of the applicable standards and agency practices, EPA's disapproval of Texas's contingency measures was arbitrary and unreasonable. Accordingly, the Final Rule should be vacated.

II.     **EPA's disapproval of Texas's contingency measure submittal under the *Sierra Club* standard was arbitrary, unreasonable, and not in accordance with the applicable law.**

EPA should have approved Texas's SIP revisions based on its long-standing policy and this Court's precedent of allowing States to rely on surplus future emissions reductions from measures that are already in place to satisfy the Act's contingency measure requirements. *LEAN*, 382 F.3d at 584. That standard remained applicable to Texas's contingency measure submittal notwithstanding the D.C. Circuit's opinion in *Sierra Club*. But even if EPA is correct that it was bound to follow *Sierra Club* generally in the Fifth Circuit, it was unreasonable for EPA to apply that standard to Texas's submittal *in this case*. *Sierra Club*'s strictly forward-looking standard could not have applied to Texas's contingency measure submittal after the applicable triggering event—in this case, the attainment date—had already passed.

**A.    EPA erred in applying *Sierra Club* to disapprove Texas's contingency measure submittal in direct conflict with this Court's precedent in *LEAN*.**

This Court previously interpreted the CAA's contingency-measure requirement to allow States to utilize surplus emissions reductions from control measures that are already in place. *LEAN*, 382 F.3d at 583-84. As this Court recognized, "the early activation of continuing contingency measures is consistent with the purpose and requirements of the CAA statute" and incentivizes States to implement "all reasonably available control measures as expeditiously as practicable." *Id.* at 583-84 (quoting 42 U.S.C. § 7502(c)(1)). While the D.C. Circuit disagreed with this interpretation in its 2021 *Sierra Club* opinion, that decision did not—and could not—overrule the controlling precedent in the Fifth Circuit. *See Gahagan v. US Citizenship & Immigration Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (explaining that, under the rule of orderliness "'[T]hree-judge panels . . . abide by a prior Fifth Circuit decision until the decision is overruled, expressly or implicitly, by either the United States Supreme Court or by the Fifth Circuit sitting en banc.'" (quoting *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001)).

Notwithstanding the D.C. Circuit's late-breaking opinion in *Sierra Club*, this Court's interpretation of the Act in *LEAN* remained applicable to Texas's SIP submittal and EPA should have approved it on that basis. Instead, EPA waited two

years before finally announcing that it had changed its interpretation of Act to adhere to the *Sierra Club* opinion and would be disapproving Texas's contingency measures. 88 Fed. Reg. at 24,522. EPA's only explanation for its course of action was that "[t]he Agency's actions, including this rulemaking, must comport with applicable caselaw, which in this situation includes the D.C. Circuit's decision in *Sierra Club.*" C.I. 8 at 67,959. But EPA provides no explanation as to why it no longer considers *LEAN* to be applicable caselaw given that Texas's submittal is within the Fifth Circuit's jurisdiction. *See id.* at 67,958 (stating that *Sierra Club* "applies across the U.S." without addressing its relationship to *LEAN* in the Fifth Circuit). EPA's application of *Sierra Club* to disapprove Texas's pending contingency measure submittal in direct conflict with this Court's precedent in *LEAN* was unlawful and should be set aside.

**B.    EPA's interpretation of the Act to require "prospective and conditional" contingency measures even after the applicable attainment date has passed is arbitrary and unreasonable.**

Even if the *Sierra Club* standard could apply in this Circuit, it makes little sense to apply it *in this case*. By the time EPA finally disapproved Texas's contingency measures, the attainment date had already passed. Once the attainment date passed, Texas's measures could not have been truly "contingent" as EPA now reads the statute; they could neither be prospective nor conditional as contemplated

by *Sierra Club*. *See* C.I. 8 at 67,957-58. And EPA's requirement that Texas must now submit new "contingency" measures that are prospective and conditional, yet must be immediately implemented, is equally unreasonable and imposes an unattainable standard on the States. EPA arbitrarily held—and continues to hold—Texas to a standard that cannot be met post-attainment date.

1.    EPA waited until two years after the applicable attainment date to disapprove Texas's contingency measures. C.I. 8. Given that the disapproval came *after* the applicable triggering event, it is difficult to understand EPA's insistence that the submitted measures must be both "prospective" and "conditional." Even if EPA could apply this standard in evaluating *future* SIP revisions (*i.e.,* contingency measure proposals for future attainment dates), it makes little sense to do so here. The condition precedent for implementation of the contingency measures—failure to attain by the applicable attainment date—occurred in the past. Anything that Texas submitted could not have truly been "prospective" in that it would occur at some point in the future, nor "conditional" in that would it kick in upon occurrence of the triggering event. *See Sierra Club*, 21 F.4th at 828 (citing *Bahr*'s conclusion that contingency measures are "control measures that will be implemented in the future" 836 F.3d at 1235).

Once the attainment date passed, any measures proposed by Texas would have simply been emissions reductions measures that would immediately "take effect without further action by the State" upon approval by EPA. 42 U.S.C. § 7511a(c)(9). In that regard, it matters not whether the reductions are achieved by control methods that are already in place or by completely new methods. The only relevant inquiry is whether the State can achieve the necessary emissions reductions to further the goal of attainment of the NAAQS through quickly implementable measures. *See General Preamble*, 57 Fed. Reg. 13,511 (contingency measures should "ensure that an appropriate level of emissions reduction progress continues to be made" if milestone is not met). And, as this Court has recognized, "[t]he setting aside of a continuing, surplus emissions reduction fits neatly within the CAA's requirement that a necessary element of a contingency measure is that it must 'take effect without further action by the State or [EPA].'" *LEAN*, 382 F.3d at 584 (quoting 67 Fed. Reg. 60592 (Sept. 26, 2002)).

EPA's reliance on *Sierra Club* in this case is particularly misplaced given that the court's analysis there is predicated on the assumption that all contingency measure proposals will be timely approved (*i.e.*, before the triggering event occurs). The opinion does not address, or even consider, the situation here where the attainment date has already passed. *See Sierra Club*, 21 F.4th at 827-28. Indeed, as

EPA acknowledged, these situations generally should not occur. C.I. 8 at 67,961. Yet that is exactly the situation Texas faces. Once the attainment date passed, strict compliance with the *Sierra Club* standard became impossible; Texas's submitted measures could not have truly complied with those requirements. EPA's strict adherence to the "prospective and conditional" standard to disapprove Texas's contingency measure submittal was arbitrary and unreasonable.

**2.**    In addition to disapproving Texas's already submitted measures, EPA is now requiring Texas to develop and re-submit wholly prospective and conditional measures for the Serious classification even though there is no longer a future triggering event that will occur. C.I. 8 at 67,961. If Texas cannot comply with this mandate, EPA will impose sanctions and potentially a FIP. *Id.* EPA's interpretation of the Act to require Texas to submit new "contingency" measures that are strictly prospective and conditional at this stage is contrary to the court's reasoning in *Sierra Club* and imposes requirements on Texas that are highly impracticable, if not impossible, to meet.

Any measures that Texas submits at this stage cannot be "prospective" because EPA requires the measures to be immediately put in place. As EPA noted in its Final Rule, the "measures would apply prospectively in that they would achieve emissions reductions after being developed and implemented, and the State should

*develop and implement them as soon as possible.*" C.I. 8 at 67,961 (emphasis added). EPA's characterization of the measures as "prospective" here is without meaning. Measures that are to be implemented as soon as possible are not measures that are truly "prospective" in that they will be implemented at a future date. Nor would any such measures truly be "conditional" in that they are enacted upon the *future* occurrence of a triggering event. They would simply be new. In that respect, EPA's strict adherence to its "prospective and conditional" reading of the Act is merely performative and unnecessarily limits the approvable emissions-reduction options available to States.

States already have limited options to choose from in developing approvable contingency measures under the Act. By definition, contingency measures must be designed "to take effect without further action by the State or the Administrator," 42. U.S.C. § 7511a(c)(9), and must be swiftly implemented during the contingency period upon an area's failure to meet an applicable milestone. 57 Fed. Reg. at 13,512 ("EPA will expect all actions needed to affect full implementation of the measures to occur within 60 days after EPA notifies the State of its failure."). This means that large-scale changes in industrial processes or equipment upgrades are not suitable as contingency measures. Practically speaking, there are only so many feasible control

options that can be implemented in such a short timeframe that are capable of achieving the required 3% emissions reduction.

EPA's new "prospective and conditional" interpretation limits the already dwindling pool of approvable contingency measures even further.[9] States can no longer rely on *any* emissions control methods that are currently in place in the nonattainment region, even if those methods could be used to obtain surplus emissions reductions during the contingency period. *Sierra Club*, 21 F.4th at 827. For nonattainment areas that have exhausted the few available measures, those states are left with no feasible options. This is especially true in the present case, where EPA is requiring Texas to provide new measures for the superseded Serious classification that are immediately deployable, yet somehow prospective and conditional, while simultaneously fulfilling its true contingency measure obligations under the updated Severe classification—all while sanctions and FIP clocks continue to run. C.I. 8 at 67,961. In essence, EPA is asking Texas to backfill its obligation to provide "contingency" measures for the Serious classification using its limited options of truly contingent control methods that could more appropriately be used for the updated Severe classification. Given that the measures for the Serious

---

[9] EPA acknowledged this shortcoming in its most recent draft contingency-measures guidance, providing instructions for States to make an infeasibility justification if they could not identify measures capable of achieving the necessary emissions reductions. 88 Fed. Reg. 17,571, 17,571 (Mar. 23, 2023).

classification cannot ever truly be "contingent"—they can only be immediately implemented—it is unreasonable for EPA to read the Act to eliminate reliance on surplus emissions from previously implemented measures under these circumstances.

While the D.C. Circuit may have read the Act's contingency-measure requirement to require strictly prospective and conditional measures, it did so in the context of a rulemaking that necessarily contemplates timely submitted and approved contingency measures. *Sierra Club*, 21 F.4th at 828. In atypical scenarios such as this one, a more flexible interpretation of the Act is warranted. Once the attainment date has passed, the focus of the inquiry should be on whether the state can achieve the required 3% emissions reductions in furtherance of attaining the NAAQS in a way that is practical and attainable. *See LEAN*, 382 F.3d at 583-84. EPA's insistence that Texas submit measures that are entirely "conditional and prospective" at this procedural posture is unreasonable and inconsistent with the nonattainment plan's goal of promoting attainment of the NAAQS through the implementation of "all reasonably available control measures." *See* 42 U.S.C. § 7502(c)(1).

*Sierra Club*'s strictly forward-looking requirements cannot apply, in any meaningful way, to post-attainment date scenarios. Given the timeline of events and

the unique circumstances of this case, EPA's reliance on *Sierra Club* to disapprove Texas's contingency measures was arbitrary, unreasonable, and an abuse of discretion. Accordingly, EPA's Final Rule must be vacated.

## CONCLUSION

EPA's Final Rule disapproving Texas's contingency-measure SIP revisions for the DFW and HGB Serious ozone nonattainment areas for the 2008 8-hour ozone NAAQS is arbitrary, capricious, and not in accordance with the law. Accordingly, Petitioners respectfully request that the Court grant their petition for review and vacate EPA's Final Rule.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ Erin K. Snody*
ERIN K. SNODY
Assistant Attorney General
State Bar No. 24093056
Erin.Snody@oag.texas.gov

JOHN R. HULME
Assistant Attorney General
State Bar No. 10258400
John.Hulme@oag.texas.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Phone: (512) 475-4019
Fax: (512) 320-0911

**Attorneys for Petitioners State of Texas
and the Texas Commission on
Environmental Quality**

**CERTIFICATE OF SERVICE**

I certify that on February 21, 2024, the foregoing document was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon the following registered CM/ECF users:

Benjamin Grillot
Trial Attorney
United States Department of Justice
150 M. Street
Washington, DC 20002

*Attorney for Respondents, EPA*
*and Michael S. Regan, Administrator of the EPA*

*/s/ Erin K. Snody*
Erin K. Snody

**CERTIFICATE OF COMPLIANCE**

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,667 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in the Equity Text A font 14-point type face.

*/s/ Erin K. Snody*
Erin K. Snody

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I certify that, in the foregoing brief using the Fifth Circuit CM/ECF document filing system, 1) required privacy redactions have been made, 5TH CIR. R. 25.2.13; 2) the electronic submission is an exact copy of the paper document, 5TH CIR. R. 25.2.1; and 3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Erin K. Snody*
Erin K. Snody

Dated: February 21, 2024