No. 23-60616

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF TEXAS; TEXAS COMMISSION
ON ENVIRONMENTAL QUALITY,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

Respondents.

On a Petition for Review of Agency Actions of the
United States Environmental Protection Agency

## EPA'S RESPONSE BRIEF

Of Counsel:

Corin James
U.S. Environmental Protection Agency
Office of General Counsel
Washington, DC

Joshua Olszewski
U.S. Environmental Protection Agency
Region 6
Dallas, TX

TODD KIM
Assistant Attorney General

BENJAMIN J. GRILLOT
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0303

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to the fourth sentence of Fifth Circuit Rule 28.2.1, respondents need not

provide a certificate of interested parties as all parties are governmental entities.

*/s/ Benjamin Grillot*
Benjamin Grillot

**STATEMENT REGARDING ORAL ARGUMENT**

Respondents United States Environmental Protection Agency ("EPA") and Michael S. Regan request oral argument. The petition involves the nuanced issues of compliance with the Clean Air Act, a complex and technical statute. Adjudicating the merits of the petition for review will therefore require the Court to consider a substantial amount of complex information with significant impacts. The Court would therefore benefit from oral argument.

s/ *Benjamin J. Grillot*
BENJAMIN J. GRILLOT

# TABLE OF CONTENTS

GLOSSARY .................................................................................................xiv

INTRODUCTION .........................................................................................1

STATEMENT OF JURISDICTION .............................................................2

STATEMENT OF ISSUES ...........................................................................3

STATEMENT OF THE CASE .......................................................................3

I.  GROUND LEVEL OZONE .................................................................3

II.  STATUTORY FRAMEWORK .............................................................4

    A.  Step One: Establishment of the NAAQS ...................................4

    B.  Step Two: Area Designations of Attainment,
        Nonattainment, and Unclassifiable .........................................5

    C.  Step Three: Implementation of Plans to Attain the New
        NAAQS ....................................................................................7

III.  FACTUAL AND PROCEDURAL BACKGROUND ...........................10

SUMMARY OF ARGUMENT......................................................................15

STANDARD OF REVIEW ..........................................................................17

ARGUMENT ...............................................................................................18

I.  EPA reasonably construed the CAA to require contingency measures to
    be prospective and conditional...................................................................18

    A.  This Court should defer to EPA's current interpretation of
        the CAA's contingency measures provisions, applying
        Brand X and Gonzales-Veliz ....................................................20

        1.  In *LEAN* this Court found a plain reading of the
            contingency measures provision compelling ...................22

2.      Since *LEAN* two separate circuits have concluded that EPA's prior interpretation was inconsistent with the plain language of the CAA ..........................23

3.      Even if *Chevron* deference does not apply, EPA's interpretation should still be given *Skidmore* deference...............................................................26

B.      Even if deference principles do not apply, EPA's action should be upheld because it is the best interpretation and most faithful to the plain statutory language ...............................28

1.      The Ninth Circuit and D.C. Circuit found the statutory language to clear and require contingency measures to be prospective and conditional....................................29

2.      The plain language of the statute may properly be given predominant weight ..................................................32

C.      Upholding EPA's reasonable interpretation promotes national uniformity and consistency...........................................................35

D.      EPA provided Texas fair notice of the standards by which EPA would judge Texas's SIP revisions ......................................36

E.      EPA was not required to approve Texas's SIP submission based on policies in place at the time of submission ................................37

II. EPA reasonably required Texas to comply with the CAA .........................................41

A.      The mandatory reclassification of the Houston and Dallas areas from Serious to Severe does not excuse Texas from developing and implementing contingency measures required for the Serious attainment plan.......................................42

B.      The passage of the attainment deadline does not excuse Texas from developing and implementing contingency measures ...................................................................45

C.      Texas in not excused from developing and implementing contingency measures because doing so is allegedly difficult ..................47

CONCLUSION..............................................................................................................48

# TABLE OF AUTHORITIES

## Cases

*Am. Petroleum Inst. v. Costle,*
  665 F.2d 1176 (D.C. Cir. 1981) .......................................................4

*Am. Petroleum Inst. v. EPA,*
  787 F.2d 965 (5th Cir. 1986) ........................................................18

*Ass'n of Irritated Residents v. EPA,*
  10 F.4th 937 (9th Cir. 2021) ........................................................30

*Bahr v. EPA,*
  836 F.3d 1218 (9th Cir. 2016) ....................... 15, 23, 29, 30, 31, 32

*Baylor Cnty. Hosp. Dist. v. Price,*
  850 F.3d 257 (5th Cir. 2017) ........................................................27

*BCCA Appeal Grp. v. EPA,*
  355 F.3d 817 (5th Cir. 2003) ..........................................................4

*Biden v. Texas,*
  597 U.S. 785 (2022) ......................................................................40

*Carcieri v. Salazar,*
  555 U.S. 379 (2009) ......................................................................33

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
  467 U.S. 837 (1984) ...............................................15, 16, 18, 20, 21

*Coal. Against Columbus Ctr. v. New York,*
  967 F.2d 764 (2d Cir. 1992) .........................................................45

*Contender Farms, L.L.P. v. USDA,*
  779 F.3d 258 (5th Cir. 2015) ........................... 15, 22, 29, 32

*Delaney v. EPA,*
  898 F.2d 687 (9th Cir. 1990) ............................................44, 45, 46

*Dodd v. United States,*
    545 U.S. 353 (2005) ...............................................................30

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 151 (2016) ...........................................................21, 24

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...............................................................21

*Forest Guardians v. U.S. Fish & Wildlife Serv.,*
    611 F.3d 692 .........................................................................42

*Forrest Gen. Hosp. v. Azar,*
    926 F.3d 221 (5th Cir. 2019) .................................................18

*Galveston-Houston Ass'n for Smog Prevention v. EPA,*
    289 F. App'x 745 (5th Cir. 2008) .............................................6

*Gonzalez-Veliz v. Barr,*
    938 F.3d 219 (5th Cir. 2019) .............15, 20, 24, 25, 26, 33, 38, 39

*Henrikson v. Guzik,*
    249 F.3d 395 (5th Cir. 2001) .................................................28

*Johnson v. McDonald,*
    762 F.3d 1362 (Fed. Cir. 2014) .............................................33

*La. Env't Action Network v. EPA ("LEAN"),*
    382 F.3d 575 (5th Cir. 2004) .............19, 20, 21, 22, 23, 26, 28, 29, 31, 33

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) ...........................................................24, 25

*Luminant Generation Co. LLC v. EPA,*
    714 F.3d 841 (5th Cir. 2013) .................................................18

*Miss. Comm'n on Env't Quality v. EPA,*
    790 F.3d 138 (D.C. Cir. 2015) .................................................4

*Mississippi v. EPA,*
 744 F.3d 1334 (D.C. Cir. 2013) .................................................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
 463 U.S. 29 (1983) ...................................................................................17

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
 551 U.S. 644 (2007) .................................................................................42

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs. ("Brand X"),*
 545 U.S. 967 (2005) ...........................................15, 20, 21, 26, 27

*NRDC v. EPA,*
 464 F.3d 1 (D.C. Cir. 2006) .....................................................................3

*R.J. Reynolds Vapor Co. v FDA,*
 65 F.4th 182 (5th Cir. 2023) ..................................................................38

*Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.,*
 29 F.3d 655 (D.C. Cir. 1994) ..................................................22, 29, 32

*Sebelius v. Cloer,*
 569 U.S. 369 (2013) .................................................................................33

*Sierra Club v. EPA,*
 21 F.4th 815 (D.C. Cir. 2021) .............................12, 15, 23, 30, 31, 32, 35, 41

*Skidmore v. Swift & Co.,*
 323 U.S. 134 (1944) .................................................................................28

*State Farm Fire & Casualty Co. v. United States,*
 580 U.S. 26 (2016) ............................................................................ 1, 30

*Sw. Elec. Power Co. v. EPA,*
 920 F.3d 999 (5th Cir. 2019) ............................................................ 17, 18

*Tex. Oil & Gas Ass'n v. EPA,*
 161 F.3d 923 (5th Cir. 1998) ..................................................................26

*Texas v. EPA,*
 91 F.4th 280 (5th Cir. 2024) ....................................................................5

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ...........................................................47

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ........................................................ 3, 4

*Union Elec. Co. v. EPA,*
    427 U.S. 246 (1976) ........................................................................9

*WildEarth Guardians v. EPA,*
    830 F.3d 529 (D.C. Cir. 2016) .....................................................45

**Statutes**

5 U.S.C. § 706(2)(A) ...........................................................................17

42 U.S.C. § 7401(b)(1) ..........................................................................4

42 U.S.C. § 7407(a) ...............................................................................7

42 U.S.C. § 7407(d)(1)(A)(i) ..................................................................5

42 U.S.C. § 7409 ...................................................................................4

42 U.S.C. § 7409(d) ...............................................................................5

42 U.S.C. § 7410 ...................................................................................7

42 U.S.C. § 7410(a) ...............................................................................9

42 U.S.C. § 7410(a)(1) ...........................................................................7

42 U.S.C. § 7410(a)(2)(D)(i)(I) ..............................................................7

42 U.S.C. § 7410(k) .....................................................................9, 38, 40

42 U.S.C. § 7410(k)(2) ..........................................................................42

42 U.S.C. § 7410(k)(3) ..........................................................................42

42 U.S.C. § 7410(k)(5) ................................................................40

42 U.S.C. § 7410(k)(6) ................................................................40

42 U.S.C. § 7410(l) .......................................................................41

42 U.S.C. § 7416 ..........................................................................34

42 U.S.C. § 7502 ............................................................................7

42 U.S.C. § 7502(b) ........................................................................7

42 U.S.C. § 7502(c) ........................................................................7

42 U.S.C. § 7502(c)(2) ....................................................................8

42 U.S.C. § 7502(c)(3) ....................................................................8

42 U.S.C. § 7502(c)(9) ...................... 1, 8, 10, 12, 13, 14, 18, 19, 30

42 U.S.C. § 7511 .........................................................................5, 6

42 U.S.C. § 7511(a)(1) ..................................................................29

42 U.S.C. § 7511(b)(2) .............................................................10, 13

42 U.S.C. § 7511(b)(3) ....................................................................6

42 U.S.C. § 7511a ........................................................................6, 7

42 U.S.C. § 7511a(c)(9) ..................... 1, 8, 9, 10, 11, 13, 14, 19

42 U.S.C. § 7511a(d) ..................................................................6, 13

42 U.S.C. § 7511a(g) .....................................................................19

42 U.S.C. § 7513(b)(2) ....................................................................6

42 U.S.C. § 7513(b)(2)(A) ...............................................................6

42 U.S.C. § 7601 ..........................................................................35

42 U.S.C. § 7601(a)(2)(A) ..................................................................35

42 U.S.C. § 7604(a)(2) ......................................................................40

42 U.S.C. § 7607(b) ...........................................................................35

42 U.S.C. § 7607(b)(1) .........................................................................2

42 U.S.C. §§ 7401–7671q ....................................................................4

42 U.S.C. § 7502(c)(9) .............................. 1, 8, 10, 12, 13, 14, 18, 30, 31

42 U.S.C. § 7511 ..............................................................................5, 6

**Rules**

Fed. R. App. P. 27(d)(2)(A) ...............................................................49

Fed. R. App. P. 32(a)(5) .....................................................................49

Fed. R. App. P. 32(a)(6) .....................................................................49

Fed. R. App. P. 32(f) ..........................................................................49

**Code of Federal Regulations**

40 C.F.R. § 51.1100(t) .........................................................................8

40 C.F.R. § 51.1303 .............................................................................5

40 C.F.R. § 56.3(a) .............................................................................35

40 C.F.R. § 56.3(d) .............................................................................35

40 C.F.R. § 56.5(b) .............................................................................35

**Federal Registers**

57 Fed. Reg. 13498 (Apr. 16, 1992) ........................................19, 23, 44

67 Fed. Reg. 60590 (Sept. 26, 2002) ................................................23

73 Fed. Reg. 16436 (Mar. 27, 2008) ......................................................5

80 Fed. Reg. 12264 (Mar. 6, 2015) ........................................................7

83 Fed. Reg. 10376 (Mar. 9, 2018) ........................................................5

83 Fed. Reg. 35136 (July 25, 2018) .......................................................6

83 Fed. Reg. 62998 (Dec. 6, 2018) ............................................7, 19, 36

84 Fed. Reg. 44238 (Aug. 23, 2019) .....................................................10

85 Fed. Reg. 60928 (Sept. 29, 2020) ..............................................11, 14

85 Fed. Reg. 64084 (Oct. 9, 2020) ..................................................11, 14

86 Fed. Reg. 24717 (May 10, 2021) .................................12, 14, 16, 37

87 Fed. Reg. 60926 (Oct. 7, 2022) .......................................................13

88 Fed. Reg. 24522 (Apr. 21, 2023) .................................................14, 37

88 Fed. Reg. 24693 (Apr. 24, 2023) .............................................12, 14, 37

88 Fed. Reg. 67957 (Oct. 3, 2023) ...............2, 14, 24, 25, 32, 37, 38, 40, 42, 43, 46, 48

88 Fed. Reg. 87988 (Dec. 20, 2023) .....................................................47

## Other

Webster's Third New International Dictionary (2002) ....................................30

Merriam-Webster Collegiate Dictionary (11th ed. 2009) ...............................31

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551–559 |
| CAA | Clean Air Act, 42 U.S.C. §§ 7401–7671q |
| DFW | Dallas-Fort Worth air quality region |
| EPA | U.S. Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| HGB | Houston-Galveston-Brazoria air quality region |
| NAAQS | National Ambient Air Quality Standards |
| NO$_x$ | Oxides of Nitrogen |
| RFP | Reasonable Further Progress |
| SIP | State Implementation Plan |
| TCEQ | Texas Commission on Environmental Quality |
| VOCs | Volatile Organic Compounds |

# INTRODUCTION

The Clean Air Act (CAA or Act) requires States to include "contingency measures" in their State Implementation Plans (SIPs) to be implemented if the States fail to meet certain air quality targets. Specifically, the Act states that each plan "shall provide for the implementation of specific measures to be undertaken *if* the area fails" to meet National Ambient Air Quality Standards – or NAAQS. 42 U.S.C. §§ 7502(c)(9); 7511a(c)(9). Consistent with the plain reading of the statutory text, EPA has revised its interpretation of the Act to reflect that the CAA requires contingency measures that are truly contingent – that is, both conditional and prospective.

This reading is not only most consistent with the plain statutory text, but it best furthers Congress' intent to have States implement *additional* measures that will help them to meet attainment goals as soon as possible in the event that the plan and preexisting measures fail to work as predicted. As the name makes clear, Congress intended contingency measures to be just that – measures that will go into effect *if* preexisting measures are not sufficient.

Texas contends that EPA was obliged to apply a previous policy-based approach to contingency measures when assessing the SIPs at issue here, addressing the 2008 8-hour ozone NAAQS. And Texas further asserts that it did not receive adequate notice of the standards by which EPA would judge these SIPs. These arguments do not withstand scrutiny. Contrary to Texas' position, EPA was not bound to adhere to a flawed previous interpretation – one that negates plain statutory

text.  Further, EPA gave Texas ample notice, through notice and comment rulemaking, that the Agency would be applying its superior revised interpretation before it actually applied it.  Thus, Texas had an opportunity to revise its SIP submission to conform with applicable requirements prior to the EPA disapproval.

Additionally, the fact that Texas failed to attain the requisite NAAQS by the applicable "Serious" area attainment date, requiring EPA to reclassify the relevant areas from "Serious" status to "Severe" status, does not excuse Texas from adopting contingency measures with respect to the "Serious" plan that Congress required under the CAA.

Accordingly, Texas's petition should be denied.

## STATEMENT OF JURISDICTION

Under the CAA, federal courts of appeals have jurisdiction over petitions to review a "final action" taken by the EPA Administrator filed within 60 days of notice of the action.  42 U.S.C. § 7607(b)(1).  Petitioners timely filed their petition for review of EPA's final action entitled *Air Plan Disapproval; Texas; Contingency Measures for the Dallas-Fort Worth and Houston-Galveston-Brazoria Ozone Nonattainment Areas*, 88 Fed. Reg. 67957 (Oct. 3, 2023).

# STATEMENT OF ISSUES

1.    The CAA requires States to include contingency provisions in their SIPs that "provide for the implementation of specific measures to be undertaken if" an area fails to meet its attainment goals by applicable deadlines. Did EPA appropriately disapprove Texas's SIP submissions because they did not contain prospective and conditional contingency measures?

2.    The CAA requires contingency measures that will automatically go into effect and achieve additional emission reductions if attainment goals are not timely met. Did EPA appropriately require Texas to adopt, submit, and implement required contingency measures as soon as possible even though the attainment deadline had passed?

# STATEMENT OF THE CASE

## I.    GROUND LEVEL OZONE

Ground level (or ambient) ozone is a component of smog. It is distinguished from stratospheric ozone (sometimes referred to as the "ozone layer"), which protects human health and the environment by absorbing ultraviolet radiation. *NRDC v. EPA*, 464 F.3d 1, 3 (D.C. Cir. 2006). Ambient ozone is associated with adverse health effects, including decreased lung function and respiratory symptoms, as well as with impacts on the environment, including effects on trees, vegetation, and crops, and indirect effects on other ecosystem components such as soil, water, and wildlife. *Texas v. EPA*, 983 F.3d 826, 830 (5th Cir. 2020).

Ozone ($O_3$) is typically not emitted directly into the air. Instead, it forms when nitrogen oxides ("$NO_x$") and volatile organic compounds ("VOCs") (both "precursors" of ozone) react with sunlight, which occurs at different rates at different

times of the year and under various types of weather conditions. *Id.*; *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1181 (D.C. Cir. 1981). States cannot, of course, enact provisions to control the amount or intensity of sunlight or when and under what circumstances the chemical reactions forming ozone occur. Accordingly, "NAAQS compliance largely depends on reducing emissions from ozone precursor producers like power plants, industrial compounds, motor vehicles, and combustion engines." *Miss. Comm'n on Envn't Quality v. EPA*, 790 F.3d 138, 147 (D.C. Cir. 2015).

## II.  STATUTORY FRAMEWORK

The Clean Air Act, 42 U.S.C. §§ 7401-7671q (CAA), establishes a comprehensive program to protect and enhance the Nation's air quality through a Congressionally-specified system of shared federal and state responsibility. 42 U.S.C. § 7401(b)(1); *BCCA Appeal Grp. v. EPA*, 355 F.3d 817 (5th Cir. 2003). Central to this program is the establishment and enforcement of the NAAQS, which occurs through a three-step process.

### A. Step One: Establishment of the NAAQS

In Step One, EPA is required to establish NAAQS for criteria pollutants, the attainment of which will provide requisite protection to public health and welfare. 42 U.S.C. § 7409. EPA sets the level and form of the NAAQS for each covered pollutant based on the scientific information and data available at the time the agency promulgates a new or revised NAAQS.

EPA is required to periodically review and, if appropriate, revise the NAAQS for each criteria pollutant based on the latest scientific evidence related to the health and welfare impacts of that pollutant. *Id.* § 7409(d); *Mississippi v. EPA*, 744 F.3d 1334, 1339 (D.C. Cir. 2013). In 2008, EPA revised the primary and secondary NAAQS for ozone to a level of 0.075 ppm. 73 Fed. Reg. 16436 (Mar. 27, 2008). This is the specific iteration of the ozone NAAQS that is at issue in this case.

### B. Step Two: Area Designations of Attainment, Nonattainment, and Unclassifiable

#### 1. The Bases for NAAQS Designations

In Step Two (the designation process), EPA promulgates designations for each county or similar area of the country. Any area that meets the NAAQS for the pollutant in question and does not contribute to a violation in a nearby area is designated an "attainment" area. *Texas v. EPA*, 91 F.4th 280, 286 (5th Cir. 2024). EPA designates any area as "nonattainment" if it "does not meet (or [ ] contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard [NAAQS] for the pollutant." 42 U.S.C. § 7407(d)(1)(A)(i).

For ozone, the statute further divides nonattainment into five classifications, ranging from Marginal nonattainment to Extreme nonattainment, based on the severity of the ozone air quality problem in the area. *Id.* § 7511 (updated at 40 C.F.R. § 51.1303 to reflect 8-hour design values); 83 Fed. Reg. 10376, 10380, tbl. 2 (Mar. 9,

2018).  While all five classifications are, by definition, for nonattainment areas,

Congress requires areas with different classifications to implement different actions to

attain the NAAQS, and to do so pursuant to different deadlines.  42 U.S.C. §§ 7511,

7511a.  *See also* 83 Fed. Reg. at 35136, 35139 (July 25, 2018) ("[a]reas in the lower

classification levels have fewer and/or less stringent mandatory air quality planning

and control requirements than those in higher classifications."); *Galveston-Houston Ass'n*

*for Smog Prevention v. EPA*, 289 F. App'x 745, 747 (5th Cir. 2008).  The emission

control requirements at each classification of nonattainment are additive, e.g., if a

State does not attain the NAAQS even after imposition of controls required for a

nonattainment area classified as "Serious," the State must then impose the additional

controls required for an area classified as "Severe."  42 U.S.C. § 7511a(d).  Within six

months of the applicable attainment date for an ozone nonattainment area, EPA must

make a determination as to whether the State attained the standard by that date.  *Id.* §

7513(b)(2).  With a couple of exceptions not relevant here, areas that fail to attain by

the applicable attainment date "shall be reclassified by operation of law" to the next

higher classification.  *Id.* § 7513(b)(2)(A).

A State may also voluntarily request to be reclassified to a higher classification.

CAA section 181(b)(3) provides for such "voluntary reclassification," and States that

"[t]he Administrator shall grant the request of any State to reclassify a nonattainment

area in that State . . . to a higher classification."  *Id.* § 7511(b)(3).

## C. Step Three: Implementation of Plans to Attain the New NAAQS

While EPA establishes the NAAQS and designates areas as attainment, nonattainment or unclassifiable, Congress assigned to States the primary responsibility to implement the NAAQS, which is Step Three of the NAAQS process. *Id.* §§ 7407(a), 7410, 7502. States fulfill this responsibility primarily through developing State Implementation Plans ("SIPs"). *Id.* §§ 7410, 7502, 7511a. EPA has issued a series of Implementation Rules for different iterations of the ozone NAAQS. *See, e.g.*, 80 Fed. Reg. 12264 (Mar. 6, 2015) (2008 Ozone NAAQS Implementation Rule); 83 Fed. Reg. 62998 (Dec. 6, 2018) (2015 Ozone NAAQS Implementation Rule). These Implementation Rules are designed to guide States' development of nonattainment plans, provide guidance for the different SIP elements required, and set deadlines for States' plans in accordance with CAA Section 172(b), 42 U.S.C. § 7502(b).

Each State must have SIPs that provide for implementation, maintenance, and enforcement of the NAAQS within its jurisdiction, and to meet other requirements, such as prohibiting "significant contribut[ions] to nonattainment" and "interfere[nce] with maintenance" of the NAAQS in other states. *Id.* § 7410(a)(1), (a)(2)(D)(i)(I). States with ozone NAAQS nonattainment areas have to meet additional SIP requirements. *Id.* §§ 7502(c), 7511a.

Specifically, States with ozone NAAQS nonattainment areas must make a SIP submission including – among other things: an emissions inventory; provisions that impose all reasonably available control measures (RACM), including reasonably

7

available control technology (RACT), that are needed for attainment of the NAAQS at issue; a modeled attainment demonstration establishing that the area will attain by the applicable attainment date; provisions that ensure "reasonable further progress"[1] toward attainment; and – for nonattainment areas classified Moderate (and higher) – "contingency measures."  42 U.S.C. § 7502(c)(2),(3),(9).  With respect to contingency measures, the statute specifies both that a State's SIP submission must "provide for the implementation of" such measures and that "[s]uch measures shall be included in the plan revision…"  *Id.* § 7502(c)(9).  Each nonattainment level plan submission (e.g.,. "Serious" or "Severe") must meet the contingency measure requirements for the applicable classification. *Id.* § 7511a(c)(9).

Contingency measures are "specific measures to be undertaken if the area fails to meet any applicable milestone," *id.*, "make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable." *Id.* § 7502(c)(9).  In other words, these are measures designed to achieve additional emission reductions in the event that something does not go as anticipated, such as when the State fails to attain the NAAQS by the approved attainment date in the nonattainment plan, as actually occurred here for the Dallas and Houston areas. These "measures shall be included in the plan revision as contingency measures to

---

[1] EPA interprets the Reasonable Further Progress requirement for Serious ozone areas to require an average of 3 percent per year emissions reduction of either volatile organic compounds (VOC) or nitrogen oxides (NOx), 40 C.F.R. § 51.1100(t).

take effect in any such case without further action by the State or the Administrator."
*Id.*; *see also id.* § 7511a(c)(9) (restating the same requirement for Serious ozone nonattainment areas). By their very nature, then, contingency measures must be measures that will achieve additional emissions reductions above and beyond whatever other emissions reductions the State is already relying on to meet other SIP requirements in the State's plan, such as to demonstrate Reasonable Further Progress.

To meet SIP requirements, States develop and submit a SIP submission or revision to EPA for evaluation. *Id.* § 7410(a). EPA's authority and responsibility is then to determine whether the SIP submission meets applicable statutory and regulatory requirements, and to approve, disapprove, partially approve and disapprove, or conditionally approve the SIP submission, based upon its evaluation of the submission. EPA must approve the SIP revision if it meets the Act's requirements. *Id.* § 7410(k); *Union Elec. Co. v. EPA*, 427 U.S. 246, 251 (1976) ("[e]ach State is given wide discretion in formulating its plan, and the Act provides that the Administrator 'shall approve' the proposed plan" if it meets the criteria specified in the statute.). Thus, consistent with requirements specified in the Act, States have primary responsibility for developing the measures required to bring nonattainment areas within their jurisdiction into attainment, and EPA's responsibility includes assuring that the State has met the applicable requirements.

### III. FACTUAL AND PROCEDURAL BACKGROUND

In August 2019, EPA determined that seven "Moderate" nonattainment areas, including both the Dallas-Fort Worth ("Dallas") and Houston-Galveston-Brazoria ("Houston") areas, failed to attain the 2008 ozone NAAQS by the applicable attainment date, and as required by the CAA, reclassified these areas from "Moderate" to "Serious." 84 Fed. Reg. 44238 (Aug. 23, 2019); 42 U.S.C. § 7511(b)(2). This reclassification triggered Texas's obligation to submit "Serious" area nonattainment plan requirements, including contingency measures under both §7502(c)(9) and §7511a(c)(9). 84 Fed. Reg. at 44240.

EPA set a deadline of August 3, 2020, for the States with newly classified "Serious" areas, including Texas, to submit SIP revisions addressing these additional attainment plan requirements. 84 Fed. Reg. at 44245.

On May 13, 2020,[2] the Texas Commission on Environmental Quality ("TCEQ") submitted those SIP revisions to EPA. C.I. 2; C.I. 3; C.I. 4. These SIP submissions included, among other things, provisions intended to satisfy the contingency measures requirements for "Serious" nonattainment areas. With respect to the contingency measures requirement, Texas relied only on emission reductions resulting from federal control measures already in place, namely from federal vehicle

---

[2] The cover letter for Texas's submission is dated May 12, 2020. However, the SIP revision was not submitted electronically to EPA until May 13, 2020. Accordingly, this brief will utilize the May 13, 2020, date.

emission certification programs for engines, and from reformulated gasoline and low-emissions diesel requirements for both on-road and non-road vehicles.  C.I. 2 at 4-12 (Houston area); C.I. 3 at 4-14 (Dallas area); C.I. 4 at 4-13 – 4-15 (analysis for both areas).  The emission reductions attributed to these control measures exceeded the amounts required to meet the applicable 3 percent per year emissions reduction requirement for Reasonable Further Progress.  *Id.*  Because the reductions from these already implemented measures exceeded the amount required to meet Reasonable Further Progress, the State identified the excess emissions resulting from those already implemented federal mobile source control measures as contingency measures.

On September 29, 2020, EPA published a proposed rule approving the contingency measure portion of the Texas May 13, 2020 SIP revisions related to the Houston-Galveston-Brazoria area.  85 Fed. Reg. 60928 (Sept. 29, 2020).  On October 9, 2020, EPA similarly published a proposed rule to approve the contingency measure portion of the May 13, 2020 SIP revisions for the Dallas-Fort Worth area.  85 Fed. Reg. 64084 (Oct. 9, 2020).  The comment period for the Houston proposed approval closed on October 29, 2020, *see* 85 Fed. Reg. at 60928, and the comment period for the Dallas proposed approval closed on November 9, 2020, *see* 85 Fed. Reg. at 64084.

On January 29, 2021 – shortly after the comment period on EPA's proposed approvals had closed - the United States Court of Appeals for the District of Columbia Circuit issued a decision in response to challenges to EPA's 2018 rule

implementing the 2015 ozone NAAQS.  *Sierra Club v. EPA*, 21 F.4th 815 (D.C. Cir. 2021).  Among the rulings in this decision, the D.C. Circuit vacated EPA's interpretation of the CAA that allowed States to rely on already-implemented control measures to meet the statutory requirements for contingency measures in nonattainment plans for the ozone NAAQS.

In *Sierra Club*, the D.C. Circuit held that the plain text of the CAA's contingency measures provisions at 42 U.S.C. §§ 7502(c)(9) and 7511a(c)(9) requires that "contingency measures become operative only when the triggering conditions set forth in the statute occur, and not any earlier."  *Sierra Club*, 21 F.4th at 827. Accordingly, the Court concluded that "previously implemented measures cannot qualify as contingency measures."  *Id.*

In May 2021, EPA – in a separate rulemaking – finalized the September 2020 proposed approval of other aspects of the Houston SIP submission, but did not take final action on the plan's contingency measures.  86 Fed. Reg. 24717 (May 10, 2021). Similarly, in April 2023, EPA—in a separate rulemaking—finalized the October 2020 proposed approval of another aspect of the Dallas SIP submission, but did not take final action on the plan's contingency measures.  88 Fed. Reg. 24693 (Apr. 24, 2023). In both of these actions, EPA explained that it was reexamining the contingency measures element of the respective SIP submissions in light of the D.C. Circuit decision and stated that it would address those contingency measures in a future action.  86 Fed. Reg. at 24717; 88 Fed. Reg. at 24695-96.

On October 7, 2022, in a separate action, EPA determined that five "Serious" nonattainment areas, including both the Dallas and Houston areas, failed to attain the 2008 ozone NAAQS by the applicable attainment date of July 21, 2021. 87 Fed. Reg. 60926, 60929 (Oct. 7, 2022). This determination that Texas failed to attain by the attainment date in both the Dallas and Houston areas triggered the State's obligation to implement the contingency measures provisions associated with the Serious plan for both areas in accordance with CAA Sections 172(c)(9) and 182(c)(9), 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9).

Pursuant to CAA Section 181(b)(2), 42 U.S.C. § 7511(b)(2), EPA reclassified the applicable areas from "Serious" to "Severe" effective November 7, 2022. 87 Fed. Reg. at 60926. This reclassification triggered Texas's obligation to submit "Severe" area attainment planning requirements under CAA Section 182(d), 42 U.S.C. § 7511a(d), including new contingency measures with respect to the Severe area attainment date and Reasonable Further Progress milestones. 87 Fed. Reg. at 60928.

On April 21, 2023, EPA proposed to disapprove the Houston and Dallas contingency measures submitted May 13, 2020, to satisfy the "Serious" area nonattainment planning requirements. C.I. 1. As noted above, EPA had originally proposed approval of certain aspects of Texas's SIP submissions to meet Serious area requirements, including the contingency measures, in September and October of 2020. *See* 85 Fed. Reg. at 60928; 85 Fed. Reg. at 64084. But EPA had not yet finalized those proposed approvals with respect to the contingency measures

13

requirements.  *See* 86 Fed. Reg. at 24717; 88 Fed. Reg. at 24695-96.  EPA explicitly acknowledged in its subsequent April 2023 proposed disapproval that it had previously interpreted the contingency measure requirement to allow States to rely on emission reductions from "already-implemented measures," and therefore EPA had originally proposed to approve the contingency measure element of Texas's May 2020 SIP submission.  88 Fed. Reg. 24522, 24523 (Apr. 21, 2013).  However, EPA explained that the Agency now interprets CAA Sections 172(c)(9) and 182(c)(9), 42 U.S.C. §§ 7502(c)(9) and 7511a(c)(9), as requiring contingency measures to be prospective and conditional, i.e., "measures that would take effect in the event the area fails to make RFP [reasonable further progress] or attain by the applicable attainment date, not before."  88 Fed. Reg. at 24524.  Texas submitted comments on the proposed disapproval on May 22, 2023.  *See* C.I. 7.

EPA then published the Final Rule at issue in this case disapproving the Houston SIP and Dallas SIP with respect to the contingency measures requirement applicable to Serious area nonattainment plans.  C.I. 8.  In that disapproval, EPA noted the D.C. Circuit's opinion on the Implementation Rule for the 2015 NAAQS had rejected EPA's prior interpretation of contingency measures.  EPA stated that it "now agrees that the plain language" of the statute requires "that contingency measures be both conditional and prospective."  88 Fed. Reg. at 67958.

# SUMMARY OF ARGUMENT

EPA reasonably required Texas's contingency measures to be both prospective and conditional, and further reasonably required Texas to meet its still outstanding obligations as soon as possible.

First, this Court should defer to EPA's reasonable current interpretation of the CAA's contingency measures provisions, applying *Brand X* and *Gonzalez-Veliz*. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ("*Brand X*"); *Gonzalez-Veliz v. Barr*, 938 F.3d 219, 234 (5th Cir. 2019). EPA is not bound to its prior interpretation, particularly when its revised interpretation is more consistent with the plain statutory language. Notably, in *LEAN* this Court observed that a plain reading of the contingency measures provision supports EPA's present interpretation. However, this Court then found the statute ambiguous due to "statutory silence" – a view it has declined to follow in other contexts. *See Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 272 (5th Cir. 2015). Notably, since *LEAN*, two separate circuits have concluded that EPA's prior interpretation was unambiguously foreclosed by the plain language of the CAA. *Bahr v. EPA*, 836 F.3d 1218 (9th Cir. 2016); *Sierra Club v. EPA*, 21 F.4th 815 (D.C. Cir. 2021). EPA's new interpretation, developed through notice and comment rulemaking and consistent with the decisions of those courts, merits *Chevron* deference under the two-step framework from *Chevron, U.S.A., Inc. v. NRDC,*

*Inc.*, 467 U.S. 837, 842–43 (1984). Alternatively, *Skidmore* deference is appropriate should *Chevron* no longer apply.[3]

Further, going beyond deference principles, EPA's action should be upheld because EPA applied the interpretation that is the best interpretation of the plain statutory text. The statutory language by its plain terms requires contingency measures to be both prospective and conditional. EPA's prior alternative interpretation was informed by policy considerations, but those considerations should not displace the plain text. Further, applying EPA's reasonable revised interpretation here will ensure national uniformity and consistency between circuits, as intended by the CAA.

EPA provided ample notice to Texas of its intended approach to contingency measures in the SIPs at issue here. As far back as May 2021, EPA indicated its intent to review Texas's SIPs in light of the D.C. Circuit's opinion in *Sierra Club*, which vacated EPA's prior approach to contingency measures in the context of the 2015 ozone NAAQS.[4] EPA then engaged in notice and comment rulemaking to disapprove the SIPs at issue here addressing the 2008 ozone NAAQS, explaining its

---

[3] *See* footnote 6, infra.

[4] As explained above, in May 2021, EPA finalized its September 2020 proposed approval of other aspects of the Houston SIP submission, but did not take final action on the plan's contingency measures. 86 Fed. Reg. at 24717. At that time, EPA explained that it was reexamining the contingency measures element of the Houston SIP submission in light of the D.C. Circuit decision and stated that it would address those contingency measures in a separate future action. *Id.* at 24717.

new interpretation in a proposed rule that it finalized after receiving and responding to public comments.

Finally, EPA reasonably required Texas to comply with the CAA going forward. EPA's reclassification of the areas at issue from Serious to Severe nonattainment classification did not excuse Texas from its obligation to have, and implement, contingency measures required for the Serious area plan. Similarly, the fact that the applicable Serious area attainment deadline passed did not excuse Texas from developing and implementing such measures as soon as possible.

## STANDARD OF REVIEW

A final agency action may only be held unlawful and set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Where EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decision must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). This standard is "highly deferential" to the agency and courts are "not empowered" to "substitute [their] judgment for that of the agency." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019).

Thus, if the agency's reasons and policy choices "conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Id.* Further, EPA's "choice of analytical methodology [in setting and enforcing standards]

is entitled to a presumption of regularity," leaving petitioner with a "considerable burden." *Id.* (quoting *Am. Petroleum Inst. v. EPA*, 787 F.2d 965, 983 (5th Cir. 1986)).

In reviewing EPA's statutory interpretation, the Court applies the two-step framework from *Chevron, U.S.A., Inc.*, 467 U.S. at 842–43.[5]  First, using all the ordinary tools of construction, the Court asks whether Congress "has directly spoken to the precise question at issue."  *Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (citation omitted).  If the statute is ambiguous, the Court defers to a reasonable agency interpretation.  *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) (citation omitted).

## ARGUMENT

### I.   EPA reasonably construed the CAA to require contingency measures to be prospective and conditional.

At the heart of this dispute are the "contingency measures" provisions of the CAA, requiring SIPs to "provide for the implementation of specific measures to be undertaken *if*" a State either fails to attain the NAAQS or to make reasonable further progress in a nonattainment area.  42 U.S.C. § 7502(c)(9) (emphasis added). The CAA further requires that such measures "shall be included in the plan revision."  *Id.*  In relevant part, the statute reads as follows:

> **(9) Contingency measures:**  Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable

---

[5] On May 1, 2023, the Supreme Court granted cert in *Loper Bright Enters., et. al. v. Raimondo*, No. 22-451 to address whether the Court should clarify or overrule *Chevron*.

further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

*Id.*

For ozone nonattainment areas classified as Severe or above, States must have contingency measures that include an additional trigger for failure to meet an applicable milestone. 42 U.S.C. § 7511a(c)(9), (g).

Based on a policy preference, EPA previously interpreted these sections to mean that *already-implemented* measures could count as "contingency measures" so long as they met certain criteria. *See, e.g.* General Preamble, 57 Fed. Reg. 13498, 13511 (Apr. 16, 1992); *Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Non-attainment Area State Implementation Plan Requirements* (2015 Ozone NAAQS Implementation Rule), 83 Fed. Reg. 62998 (Dec. 6, 2018). In 2004, this Circuit considered the validity of EPA's prior interpretation and concluded that while a plain reading of the terms "to take effect" and "to be undertaken" would "seemingly preclude the use of past reductions which have already failed to achieve attainment," the lack of an explicit prohibition on measures which originated prior to the SIP failing created ambiguity, allowing deference under *Skidmore* to be applied in upholding EPA's policy-based preferred interpretation. *La. Env't Action Network v. EPA*, 382 F.3d 575, 583-84 (5th Cir. 2004) ("*LEAN*").

EPA has now reasonably changed its interpretation to be more faithful to a "plain reading" of the statutory text, 382 F.3d at 583, and this Court should defer to EPA's new superior interpretation. *See Brand X*, 545 U.S. at 982 ("[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion"); *Gonzales-Veliz*, 938 F.3d at 234 ("[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change.") (citation omitted). And even if deference principles were not applied, the best reading of the statute supports EPA's current interpretation – that contingency measures be both prospective and conditional. Thus, EPA's new interpretation is the best reading applying traditional tools of statutory interpretation.

Because EPA reasonably disapproved Texas's SIP submission in accordance with its new superior interpretation, this petition should be denied.

### A. This Court should defer to EPA's current interpretation of the CAA's contingency measures provisions, applying Brand X and Gonzales-Veliz

This Court should defer to EPA's revised interpretation of the contingency measures provision of the CAA. Agencies are not "permanently bound" to their first reasoned interpretation of statutory language. *Gonzalez-Veliz*, 938 F.3d at 234 (5th Cir. 2019); *see also Chevron*, 467 U.S. at 863-64 ("[a]n initial agency interpretation is not instantly carved in stone"). So long as an agency "provides a reasoned explanation for

the change" an agency is "free to change their existing policies." *Id.* (quoting *Encino*

*Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).

In doing so, however, agencies must "display awareness" that they are changing

position and show "good reasons for the new policy," but need not provide a more

detailed justification than would be required on a blank slate. *Id.*; *see also FCC v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 514 (2009) (agency not subject to "more searching

review" simply because it changed course).

Further, as the Supreme Court explained in *Brand X*, only a judicial precedent

holding that a statute "unambiguously forecloses the agency's interpretation" prevents

an agency from developing a conflicting, subsequent, agency construction. *Brand X*,

545 U.S. at 982-83. This is because the "agency remains the authoritative interpreter

(within the limits of reason) of such statute." *Id.* at 983. Accordingly, EPA is not

foreclosed from choosing a "different construction," so long as that interpretation

warrants *Chevron* deference. *Brand X*, 545 U.S. at 983.

This Court should apply *Chevron* deference to EPA's new interpretation because

the agency developed it through notice and comment in the challenged rulemaking at

issue here, and this new interpretation is more consistent with the statutory language.[6]

Further, the Fifth Circuit's decision in *LEAN* found the contingency measures

---

[6] In the event that *Chevron* were to be overturned by the Supreme Court in *Loper Bright Enters., et. al. v. Raimondo*, then this Court should defer to EPA's new interpretation applying *Skidmore*. *See infra* at 25-28.

provision of the CAA ambiguous, thus allowing this Court to adopt EPA's new interpretation under *Brand X*.  Moreover, because EPA is not asking this Court to reverse its position in *LEAN*, but instead is asking the Court to adopt EPA's revised interpretation of statutory language that this Court found ambiguous, the Fifth Circuit's Rule of Orderliness is not applicable here.

### 1. In *LEAN* this Court found a plain reading of the contingency measures provision compelling

In the *LEAN* opinion, this Court found ambiguity in the contingency measures provision, but noted that "a plain reading of the terms 'to take effect' and 'to be undertaken' suggest a "forward looking orientation" which would "seemingly preclude the use of past reductions which have already failed to achieve attainment." *LEAN*, 382 F.3d at 583.  While the Court in *LEAN* found ambiguity – it did so based on "statutory silence" – that is, the fact that the Act was silent on whether continuing emissions reductions from already implemented measures could satisfy the contingency measures requirement.[7]

The Court in *LEAN* then looked to EPA's interpretation of the contingency measures provision, as announced in EPA's General Preamble from 1992. *LEAN*,

---

[7] Notably, however, this Court has subsequently found that it is inappropriate to use statutory silence to find ambiguity and reach *Chevron* step two just because a statute does not expressly negate the existence of a claimed administrative power.  *Contender Farms, L.L.P. v. U.S.D.A.*, 779 F.3d 258, 269 (5th Cir. 2015) (agency does not receive deference merely by demonstrating statute not written in "thou shalt not" terms), *quoting Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994).

382 F.3d at 585 (citing 57 Fed. Reg. at 13517).  The Fifth Circuit did not afford EPA's

interpretation from the General Preamble *Chevron* deference because EPA had not

announced its position through "formal adjudication or notice-and-comment

rulemaking."  *LEAN*, 382 F.3d at 583.[8]  Instead, the Court found EPA's

interpretation to be "persuasive" and on that basis ruled in favor of EPA.  *Id.* at 583-

84.  In reaching this conclusion, the Fifth Circuit found the statutory language

ambiguous enough to accommodate EPA's then-current reading of the statute,

crediting its policy rationale – to incentivize States to implement additional emission

reduction measures not required for other nonattainment plan purposes prior to an

attainment deadline in an effort to achieve compliance as "expeditiously as

practicable." *Id.* at 584.

> **2. Since *LEAN* two separate circuits have concluded that EPA's prior interpretation was inconsistent with the plain language of the CAA.**

Since *LEAN* was decided in 2004, two separate circuits – the Ninth Circuit

and the D.C. Circuit – have decided that EPA's prior interpretation was inconsistent

with the plain language of the CAA and unambiguously foreclosed.  *Bahr v. EPA*, 836

F.3d 1218; *Sierra Club*, 21 F.4th 815.

---

[8] Unlike here, in *LEAN* EPA did not announce a new interpretation of the contingency measures provision in its rulemaking.  Instead, EPA referenced its historical approach to contingency measures and cited the General Preamble. Approval and Promulgation of Air Quality SIP; Lousiana: Substitute Contingency Measures, 67 Fed. Reg. 60590, 60592 (Sept. 26, 2002), *citing* 1992 General Preamble.

In light of these decisions, EPA has reasonably changed its position from the one the agency put forward in *LEAN* and concluded that the best reading of the statute is that "contingency measures" must be conditional and prospective. Thus, States cannot meet these requirements by reliance on emissions from already implemented measures that will occur regardless of whether there is ever a triggering event, and this includes reliance on emissions reductions that will occur through already implemented federal regulations applicable to engines and fuels.

Notably, in *Gonzalez-Veliz* this Court reiterated the Supreme Court's holding that an "agency may justify its policy choice by explaining why that policy is more consistent with statutory language." 938 F.3d at 234 (quoting *Encino MotorCars*, 579 U.S. at 224 and *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007)). In *Gonzalez-Veliz*, the Fifth Circuit upheld the Attorney General's revised interpretation as a "return to the statutory text as Congress created it," despite a previous agency interpretation based on policy considerations. *Gonzales-Veliz*, 938 F.3d at 235. Finally, an agency's explanation of its statutory interpretation need not be lengthy, a "reasonable, albeit brief, explanation" will suffice. *Long Island Care at Home Ltd.*, 551 U.S. at 175.

Here, EPA made its change through notice-and-comment rulemaking. In so doing, it explicitly recognized that the agency's prior interpretation "had previously allowed States to rely on already-implemented control measures" to meet the CAA's contingency measures requirement. 88 Fed. Reg. at 67957-58. EPA thus clearly

acknowledged that it was changing its position and provided ample notice of its new interpretation through notice and comment rulemaking. *Id.* at 67958.

Amici argue that EPA did not adequately articulate its rationale for its changed interpretation in the final rule disapproving Texas's SIP, and that under *Chenery*, this Court must base its decision on "what the agency said in the rule itself." Amicus Br. at 20. Here, EPA provided a "reasoned, albeit brief, explanation." *Long Island Care at Home*, 551 U.S. at 175.[9] In the final rule, EPA explained its conclusion in the Final Rule that its new approach was more consistent with the CAA's language, stating that the agency now "agrees" that "the plain language … require[s] that contingency measures be both conditional and prospective." 88 Fed. Reg. at 67958. This view of contingency measures faithfully tracks the plain meaning of the statutory language at issue and, like the Attorney General's return to the statutory language in *Gonzalez-Veliz*, is not arbitrary and capricious.

---

[9] Importantly, Texas's comments on the proposed disapproval did not suggest that *LEAN* should control. *See* C.I.7 at 3. Instead, in its comments, Texas argues that EPA "should have finalized action" on its SIPS based on the "statutory interpretation that applied" when the SIPS were submitted. *Id.* Now, for the first time before this Court, Texas and Amicus raise arguments that *LEAN* should control, *see* Amicus Br. at 15; Pet's Br. at 31-32, and EPA accordingly is addressing them for the first time here.

### 3. Even if *Chevron* deference does not apply, EPA's interpretation should still be given *Skidmore* deference.

Even if EPA's decision here is not entitled to *Chevron* deference, this Court should still defer to EPA's current interpretation because of its persuasive effect. As discussed above, EPA's interpretation of the statute marks a "return to the statutory text as Congress created it" despite EPA's prior interpretation based on policy considerations. *Gonzales-Veliz*, 938 F.3d at 235. As this Court noted in *LEAN* – and as discussed at length above - the plain text of the CAA's contingency measures provisions "seemingly precludes the use of past reductions which have already failed to achieve attainment." *LEAN*, 382 F.3d at 583. EPA's proposed approach is therefore reasonable and should be upheld.

The Amicus Brief filed in support of Petitioners asserts that "EPA is not free to shirk this Court's binding interpretation" of the statute as expressed in *LEAN*, arguing that under *Brand X*, EPA's new interpretation does not warrant *Chevron* deference and *LEAN* remains binding on EPA.[10] Doc. 27, Brief of *Amici Curiae* in Support of Petitioners ("Amicus Brief") at 15. But under *Brand X*, "[b]efore a judicial construction of a statute, whether contained in a precedent or not, may trump an

---

[10] Notably, neither Texas nor any commenter submitted comments on EPA's proposed disapproval asserting that the EPA's previous interpretation of contingency measures upheld by this Court in *LEAN* should continue to apply, as Texas now argues before this Court. Pet's Br. at 22. Accordingly, Texas has waived the right to assert such an argument. *See Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th Cir. 1998) (finding waiver for failure to raise objection during rulemaking).

agency's, the court must hold that the statute unambiguously requires the court's construction." 545 U.S. at 985.

As discussed above, this Court did not find the statute unambiguous in *LEAN*—instead, this Court found the statutory provisions ambiguous and deferred to EPA's then-interpretation of the statutory requirements. Thus, *LEAN* does not "unambiguously foreclose[] the agency's interpretation" or prevent EPA from developing a conflicting, subsequent, agency construction. *Brand X*, 545 U.S. at 982-83. In other words, because this Court found the relevant statutory language ambiguous, EPA is not foreclosed from revising its view of the proper interpretation of the statute. And this Court is not prohibited from adopting a new view of the statute, one that aligns with EPA's revised interpretation and gives that interpretation deference.

Here, EPA's revised interpretation should be given *Chevron* deference if *Chevron* remains controlling, but it at least merits *Skidmore* deference as EPA is acting within its area of expertise when it administers the complexities of the CAA. *See Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 264 (5th Cir. 2017). In *Baylor*, this Court applied *Skidmore* deference to the Department of Health and Human Service's decision classifying certain roadways for the purposes of determining the applicable Medicare reimbursement schedule, because this was part of the agency's "burden of implementing Medicare's complex programs and regulatory schemes." *Id.* Similarly, EPA's action here is unquestionably a part of implementing the CAA's "complex

programs and regulatory schemes." Further, EPA's statutory interpretation – and explanation of its interpretation – warrant "respect" to the extent they have the "power to persuade." *Henrikson v. Guzik*, 249 F.3d 395, 398 (5th Cir. 2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Here, EPA's interpretation is reasonable and consistent with the plain language of the statute, which should persuade this Court to determine that contingency measures should be prospective and conditional.

**B. Even if deference principles do not apply, EPA's action should be upheld because it is the best interpretation and most faithful to the plain statutory language.**

Even if this Court were to decline entirely to apply deference principles here, EPA's action should still be upheld because the best reading of the statutory text requires contingency measures to be prospective and conditional. Here, as this Court initially acknowledged in *LEAN*, with respect to the contingency measure requirement, "a plain reading of the terms 'to take effect' and 'to be undertaken' imply a prospective, forward-looking orientation," *LEAN* 382 F.3d at 583, and EPA properly applied that meaning.

As this Court further explained in *LEAN,* this "forward looking orientation" would "seemingly preclude the use of past reductions which have already failed to achieve attainment." *Id.* While the Court in *LEAN* found the provision ambiguous – it did so based on "statutory silence" – that is, the fact that the Act was silent on

whether continuing emissions reduction measures could be utilized as contingency measures. *Id.*

Notably, however, this Court has subsequently found that that it is generally inappropriate to find ambiguity anytime a statute does not expressly negate the existence of a claimed administrative power. *Contender Farms, L.L.P.*, 779 F.3d at 269 (agency does not receive deference merely by demonstrating statute not written in "thou shalt not" terms) (quoting *Ry. Labor Execs. Ass'n*, 29 F.3d at 671).

The approaches taken by the Ninth and D.C. Circuits here are also instructive. Both found the plain language of the statute, based on dictionary definitions, to require that contingency measures be prospective and conditional. Further, while this Court (and EPA) relied on policy rationales to support its prior approach, that prior EPA policy rationales need not override the plain text of the statute. And, notably, EPA's current interpretive approach does not discourage States from implementing control measures sooner than otherwise required if they elect to do so to try to better ensure prompt attainment in accordance with the statute's directive to States to attain the NAAQS "as expeditiously as practicable." 42 U.S.C. § 7511(a)(1).

> **1. The Ninth Circuit and D.C. Circuit found the statutory language to be clear and require contingency measures to be prospective and conditional.**

Both the Ninth Circuit and the D.C. Circuit declined to give EPA's prior interpretation deference, concluding that "Congress was clear that 'contingency measures' are control measures that will be implemented in the future." *Bahr*, 836 F.3d

29

at 1235 (9th Cir. 2016); *see also Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 946 (9th Cir. 2021); *Sierra Club*, 21 F.4th at 826. In doing so, both courts turned to the plain text of the Act. And under the plain text of the Act, State nonattainment plan SIPs are required to "provide for the implementation" of contingency measures that are "to be undertaken *if*" certain conditions are not achieved. 42 U.S.C. § 7502(c)(9) (emphasis added). These measures must then "take effect" in that area, without further action by the State or EPA. *Id.*

By definition, a measure that is "to be undertaken if" something occurs is not a measure that has already been implemented and will result in reductions regardless of whether there is ever a triggering event. *See Dodd v. United States*, 545 U.S. 353, 358 (2005) (finding the word "if" to be conditional and citing dictionary definition of "if" as meaning "on condition that"). As the Ninth Circuit found in *Bahr*, while the statute does not define the word "contingency," the "meaning of the term is not ambiguous." *Bahr*, 836 F.3d at 1235. According to the dictionary definition, the Ninth Circuit reasoned, contingency means "a possible future event or condition or an unforeseen occurrence that may necessitate special measures." *Id.* (quoting Webster's Third New International Dictionary (2002)).

Similarly, the D.C. Circuit concluded a measure "to be undertaken if" certain standards are not met is, "by definition, a measure not yet implemented." *Sierra Club*, at 828 (citing *State Farm Fire & Casualty Co. v. United States*, 580 U.S. 26, 35-36 (2016)). The Ninth Circuit also rejected the argument that the Act's lack of discussion of

continuing emissions reductions results in ambiguity.  *Bahr*, 836 F.3d at 1236.  Instead, the court found that "unless such continuing emissions reductions are 'to be undertaken' in the event of a contingency, they do not fit in the definition of 'contingency measures' provided in § 7502(c)(9)."  *Id.*

Like the Ninth Circuit, the D.C. Circuit turned to the dictionary and concluded that "contingent" means "dependent on or conditioned by something else."  *Sierra Club*, 21 F.4th at 828 (citing Merriam-Webster Collegiate Dictionary (11th ed. 2009)). Similarly, the court found that measures that are "already implemented" are not measures "to take effect" or "to be undertaken" – they are "simply measures that have failed."  *Id.*   In other words, the court found that contingency measures are supposed to be triggered by a failure to either attain the NAAQS, meet any applicable milestone, or meet reasonable further progress toward attainment.  Therefore, it reasoned, if already implemented 'contingency' measures are in place and the State still fails to attain or meet reasonable further progress, then those implemented measures are "simply measures that have failed."  *Id.*

Accordingly, the D.C. Circuit, like the Ninth Circuit, found that the CAA's "plain text expressly provides that valid contingency measures become operative only when the triggering conditions set forth in the statute occur, and not any earlier." *Sierra Club*, 21 F.4th at 827.

Further, both courts dismissed the prior EPA argument – accepted by this Court in *LEAN* - that the CAA's silence on the issue of the use of already

implemented measures created ambiguity. Instead, both courts concluded that

*Chevron* Step two is not implicated just because a statute does not expressly negate the

existence of a claimed administrative power – that is, if a statute is "not written in

'thou shalt not' terms." *Sierra Club*, 21 F.4th at 828; *see also*, *Bahr*, 836 F.3d at 1236.

This Court has come to a similar conclusion in other instances, *see, e.g.*, *Contender*

*Farms, L.L.P.*, 779 F.3d at 269 (agency does not receive deference merely by

demonstrating statute not written in "thou shalt not" terms) (quoting *Ry Labor Execs.*

*Ass'n*, 29 F.3d at 671).

EPA's current interpretation of the statute, which is grounded in the same

textual analysis applied in *Sierra Club* and *Bahr*, reflects the best interpretation of the

statute and is reasonable. As explained in the Final Rule here, the "plain language of

section 172(c)(9) and 182(c)(9) requires that contingency measures be both

conditional and prospective." 88 Fed. Reg. at 67958.

> **2. The plain language of the statute may properly be given predominant weight.**

While EPA's prior approach, which this Court acknowledged in *LEAN*, was

grounded in policy considerations and its views of the general goals of the statute,

those policy considerations need not be given precedence over the plain language of

the statute – particularly when the plain language furthers the same statutory goals.

Notably, as this Court recognized, EPA's prior approach allowed States to

"utiliz[e] contingency measures early," so long as such measures were "continuing in

nature," with the result being that "reductions may be achieved before the contingency measure is triggered." *LEAN*, 382 F.3d at 583. Further, this Court found it "illogical" to penalize areas that were "taking extra steps, such as implementing contingency measures prior to a deadline" when the overall goal of the CAA is to achieve "NAAQS compliance as 'expeditiously as practicable.'" *Id.* at 584. Finally, this Court agreed with EPA's then-reasoning that because the early-activated contingency measures took effect "without further action by the State or EPA," they were consistent with another aspect of the statutory requirement for contingency measures, i.e., that such measures go into effect without additional significant actions by either the State or EPA. *Id.*

While this Court's recognition of EPA's prior position was well-intentioned and grounded in the underlying policy goals of the CAA, they need not take precedence over the plain language of the statute applied here. *Cf. Gonzalez-Veliz*, 938 F.3d at 235 (upholding "return to the statutory text as Congress created it" despite intervening change for policy reasons); *Johnson v. McDonald*, 762 F.3d 1362, 1366 (Fed. Cir. 2014) (policy arguments not proper reason to depart from the plain language of a regulation); *see also Carcieri v. Salazar*, 555 U.S. 379, 392 (2009) (refusing to consider "competing policy views" because text "speaks for itself."); *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (policy arguments only come into play when act is ambiguous).

This is particularly true because EPA's current interpretation of the statute is not inconsistent with the policy goals, and the general purpose of the CAA that

informed EPA's prior approach.  States still have the authority to implement control measures sooner than otherwise required, in accordance with their authority under CAA Section 116.  42 U.S.C. § 7416.  And if States elect to do so in the interest of accelerating attainment, EPA supports that effort.  Thus, nothing impedes States from implementing additional control measures sooner than required.  EPA will approve SIPs containing control measures that go over and above what is otherwise required, or that implement measures sooner than otherwise required – if a State elects to include them to better ensure attainment – but such measures will not qualify as "contingency measures" because they are not conditional and prospective.

In addition, States may still rely upon and account for emission reductions from already implemented *federal* measures, such as federal mobile source measures, in meeting other nonattainment plan SIP requirements, such as emission inventories, milestone demonstrations, and attainment demonstration modeling.  Here, however, Texas did not adopt and submit specific control measures to meet the contingency measures requirement and instead relied inappropriately on already implemented federal control measures for purposes of meeting that specific requirement.  EPA's change in interpretation of the statute means only that EPA cannot approve Texas' reliance on already implemented federal mobile source measures as meeting the contingency measures requirement—but Texas is still able to rely on the resulting emission reductions to meet other SIP requirements.

### C. Upholding EPA's reasonable interpretation promotes national uniformity and consistency.

EPA does not dispute that EPA's disapproval of the Texas SIP submission for the 2008 NAAQs is regional in nature and within this Court's jurisdiction to review. However, for this Court to depart from *Sierra* Club would create significant problematic inconsistencies in the administration of the CAA.

Following the D.C. Circuit's decision in *Sierra Club*, EPA is now legally obligated to require contingency measures for the 2015 NAAQS to be both prospective and conditional across the nation.[11] Enabling EPA to apply a consistent standard for the 2008 and 2015 NAAQS across the nation would best ensure a level playing field. Indeed, it would be highly anomalous and inconsistent for EPA to apply within Texas a different interpretation of the very same statutory language depending on *which* NAAQS (i.e, 2008 or 2015) were at issue.[12] There is no logical or

---

[11] CAA Section 301, 42 U.S.C. § 7601, requires EPA to promulgate regulations "establishing general applicable procedures and policies for regional officers and employees," and directs that such regulations shall be designed "to assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the chapter." 42 U.S.C. § 7601(a)(2)(A). Pursuant to this statutory mandate, EPA has adopted a set of Consistency Regulations. 40 C.F.R. § 56.3. These regulations generally promote the goal of consistent application of EPA policies, 40 C.F.R. § 56.3(a), while recognizing that some inconsistency may develop as a result of judicial review in the D.C. Circuit and regional circuits pursuant to 42 U.S.C. § 7607(b). *See* 40 C.F.R. §§ 56.3(d), 56.5(b).

[12] Notably the 2015 Ozone NAAQS Implementation Rule expressly included "without significant revision" provisions—including contingency measures—

*Cont.*

reasonable justification for why contingency measures for the 2015 NAAQS must be conditional and prospective, but those for the 2008 NAAQS do not. Accordingly, upholding EPA's current interpretation would align EPA's approach to the same statutory language across the ozone NAAQS and across the country, providing the consistency and fairness envisioned by Congress in enacting Section 7601.

### D. EPA provided Texas fair notice of the standards by which EPA would judge Texas's SIP revisions

Texas asserts it had "no notice" of the standard by which EPA would judge its contingency measure submission. Pet's Br. at 22. This claim fails. EPA engaged in Notice and Comment rulemaking on the disapproval before the Court here. Aside from this, Texas was well aware of the agency's change in position prior to the action at issue. As a threshold matter, Texas was an intervenor in the D.C. Circuit's *Sierra Club* case, and as a party to the case, Texas was immediately aware of the outcome.

Further, as discussed above, in related rulemakings in May 2021 (Houston) and April 2023 (Dallas),[13] EPA notified Texas that the D.C. Circuit had "vacated EPA's interpretation of the CAA to allow States to rely on already implemented control measures to meet the statutory requirements [for contingency measures]." 86 Fed.

---

promulgated for implementing the 2008 ozone NAAQS. *See* 83 Fed. Reg. at 63000, 63002.

[13] In these two related rulemakings, EPA finalized approval of other requirements of Texas' 2008 Ozone NAAQS SIP submission. EPA issued a supplemental proposal with respect to the Dallas SIP approval in December 2022, which explains the different timing of these two related rulemakings.

Reg. at 24717; *see also* 88 Fed. Reg. at 24695-96. EPA then explained it was "reexamining the contingency measures portion of the TCEQ submission" in light of that decision and would "address the contingency measures in a separate future action." *Id.*

More fundamentally, EPA engaged in Notice and Comment rulemaking on the disapproval before the Court here. First, in April 2023, EPA published its proposed disapproval of the SIP revisions with respect to the contingency measures requirements. 88 Fed. Reg. at 24522. Texas provided comments, raising some of the arguments it makes here - and EPA responded to those comments in the final rule in October 2023. 88 Fed. Reg. at 67957. Thus, Texas had ample notice of the standards by which EPA was evaluating its SIP submissions in light of more recent court decisions, and the State had the opportunity to withdraw – and revise – its submission in light of the D.C. Circuit's opinion in *Sierra Club* and EPA's articulation of its revised interpretation.

### E. EPA was not required to approve Texas's SIP submission based on policies in place at the time of the submission

Petitioners assert that EPA should have approved Texas's contingency measures based on its interpretation of the statute at the time of its SIP submission. Alternatively, Petitioners suggest that EPA could have "taken no action on the submittal" once the Dallas and Houston areas were reclassified. Pet's Br. at 22. However, EPA has a mandatory duty to act on SIP submissions pursuant to Section

37

110(k), 42 U.S.C. § 7410(k), and as EPA noted in its response to comments on the final rule, Section 110(l) directs "that the agency shall not approve a revision to a SIP unless it meets applicable requirements of the CAA." *See* 88 Fed. Reg. at 67960. In other words, the fact that EPA delayed action on Texas's SIP submission does not mean that EPA could have approved a SIP submission that is substantively noncompliant with the requirements of the CAA.

Additionally, Texas argues that EPA should have declined to apply its corrected interpretation of the statute and instead take into account the State's "good-faith reliance" on EPA's "prior positions" Pet's Br. at 24-25 (quoting *R.J. Reynolds Vapor Co. v FDA*, 65 F.4th 182, 189 (5th Cir. 2023)). EPA does not dispute that EPA's prior interpretation was longstanding, nor that Texas may have relied on it at one time. As explained above, agencies may change their positions as long as they are "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Gonzales-Veliz*, 938 F.3d at 234 (cleaned up). What Texas ignores is that EPA's disapproval here was based on a valid change in interpretation, and that the State was given ample notice and opportunity to conform its SIP to applicable requirements.

Indeed, in its public comments on the proposed disapproval, Texas appears to concede that EPA's prior interpretation no longer applies, stating that "[t]he EPA should have finalized action on the contingency measures portions of Texas' SIP submittals proposed in 2020, based on the established requirements and statutory

interpretation that *applied* when the 2008 eight-hour ozone standard serious classification SIP revisions were due and submitted," C.I. 7 at 3 (emphasis added), and acknowledges that the *Sierra Club* decision "vacated the EPA's interpretation of the F[ederal] CAA that allowed States to rely on already implemented control measures to meet the statutory requirements of FCAA, §172(c)(9) or §182(c)(9) for contingency measures in nonattainment plans for ozone NAAQS." *Id.* at 3. At no point did Texas explain why EPA's current interpretation is inconsistent with the statutory text, nor why the reliance interests undermine EPA's approach. EPA was "cognizant" of such interests and Texas' arguments to the contrary fail. *Gonzales-Veliz*, 938 F.3d at 234.

Petitioners also fault EPA for not timely approving the SIP submissions at issue in this case. Pet's Br. at 22. Petitioners argue that if EPA had taken timely action on the contingency measures Texas submitted in May 2020, then EPA could have approved those contingency measures in accordance with its interpretation of the statute at the time, which allowed States to rely on the emission reductions from already implemented measures such as federal mobile source controls to meet the contingency measure requirement. Pet's Br. at 22.

Petitioner's arguments here that EPA unreasonably delayed action on Texas's SIP submission are beside the point. The timeliness of EPA's action on a State's SIP

submission is not relevant to EPA's obligation to take the correct action when it does so, even if that action is delayed.[14]

The statutory language in the CAA is clear that EPA was required to take final action on the Petitioners' SIP submissions by certain deadlines under 42 U.S.C. § 7410(k). EPA acknowledges that those deadlines were missed. But the Court has no basis to read bad faith or improper motive into the delay and ultimate disapproval. *See Biden v. Texas*, 597 U.S. 785, 811-12 (2022) (holding that a presumption of regularity attends agency action absent a "strong showing of bad faith or improper behavior" (quotation omitted)).

And even if EPA had approved the submissions based on an interpretation later shown to be incorrect, nothing would have barred EPA from correcting that approval based on later information indicating that its earlier approval was erroneous. See Final Rule at 67960; *see also* 42 U.S.C. § 7410(k)(6) (providing EPA the authority to correct SIP actions that later prove to be in error); *id.* § 7410(k)(5) (providing EPA "shall require" a State to revise its plan upon EPA's finding that the applicable implementation plan for any area is "substantially inadequate" due to a failure to "comply with any requirement"). Thus, an earlier approval based on an interpretation

---

[14] The Act provides judicial recourse when there is an alleged failure by EPA to perform a nondiscretionary duty to act on a SIP submission by the applicable statutory deadline—for EPA to be placed on a court-ordered deadline to address the relevant obligations. 42 U.S.C. § 7604(a)(2). Notably, Petitioners failed to seek such relief.

later shown to be flawed would not have insulated the State from a later action to rectify the failure to have valid contingency measures. The mere fact that EPA missed a statutory deadline to act on the SIP submissions at issue does not cabin what EPA may consider at the time it acted.

Further, EPA had no remaining discretion to decline to apply an interpretation determined to be inconsistent with the statutory language simply because Texas' SIP submission predated clarification of the correct interpretation. Simply put, EPA cannot approve a SIP submission that is substantively noncompliant with the requirements of the CAA, regardless of when the State submitted the SIP revision. *See id.* § 7410(l)).

## II.    EPA reasonably required Texas to comply with the CAA

Texas alternatively claims that even if EPA properly followed the statutory analysis articulated in *Sierra Club*, EPA should not have disapproved its SIP revisions with respect to the contingency measures requirement because (1) the areas at issue were reclassified from Serious to Severe nonattainment by the time disapproval occurred; and (2) the nonattainment date applicable to the areas as Serious nonattainment areas has passed and thus now no measures can be "truly contingent." However, both of these arguments fail.

EPA's disapproval of the Houston and Dallas SIP submissions – and the corresponding requirement that Texas follow the CAA and develop and submit

compliant contingency measures "as soon as reasonably possible" – is not arbitrary or capricious.

### A. The mandatory reclassification of the Houston and Dallas areas from Serious to Severe does not excuse Texas from developing and implementing contingency measures required for the Serious attainment plan

First, Texas asserts that EPA cannot act on pending SIP revisions once an area has been reclassified. This claim fails. Once a State has submitted a SIP, the CAA requires EPA to act on the submission – either by approval (in full, partially, or conditionally) or disapproval. 42 U.S.C. § 7410(k)(2), (3).

Texas points to an August 2019 memo written after the Houston and Dallas areas were reclassified from Moderate to Serious for the 2008 ozone NAAQS. Pet's Br. at 27-28. The memorandum to file, written by an "Environmental Scientist," States that due to the reclassification, the Moderate SIP submissions were "considered moot" because the State would need to submit new SIP revisions for the new Serious area plan requirements. C.I. 9.

As explained in the Final Rule here, EPA has disavowed this memo. 88 Fed. Reg. at 67958. Federal courts only review an "agency's *final* action," not a "preliminary determination by a local agency representative" that is "later overruled at a higher level." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658-59 (2007) (emphasis in original); *see also Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 718 (declining to ascribe to an agency the "stray comments of a low-level

scientist or two—no matter how vigorously expressed."). This memo was not written by someone in a position within EPA to speak on behalf of the agency and does not reflect the agency's final position.[15] 88 Fed. Reg. 67958.

Further, as EPA explained in the action at issue here, contingency measures cannot be mooted, and instead are triggered, once EPA makes a determination that an area has failed to attain by its applicable attainment date. *Id.* It would be absurd to conclude that Texas's failure to attain that resulted in reclassification to a higher classification could somehow moot the contingency requirement that must be triggered by the same failure to attain. *Id.* This reading would "effectively render the contingency measure requirement meaningless." *Id.* As EPA explained in the General Preamble in 1992, if an area fails to attain and is therefore "bumped up" to a higher classification, then "contingency measures would be implemented while the State developed and adopted the new measures associated with the [new] classification." 57

---

[15] The Moderate SIP submissions addressed in the August 2019 Memo were also incorrectly classified as "returned to the State" in EPA's database for tracking required SIP elements (State Planning Electronic Collaboration System or "SPeCS"). Because EPA never took action on these Moderate SIP submissions, these submissions should be classified as "active-backlogged" in the system. EPA acknowledges that it never took subsequent action to correct this error in the system and classify the Moderate SIPs addressed in the August 2019 Memo as "active-backlogged" instead of "returned to the State." However, EPA's position remains that the August 2019 Memo and the corresponding status updates in SPeCS were incorrect and do not accurately reflect the Agency's position that a failure to attain does not "moot" the SIP elements required under the previous classification.

Fed. Reg. at 13511.  This longstanding policy cannot be, and was not, superseded by a memo by a staff-level employee.

It is true that when a State seeks *voluntary* reclassification before the applicable attainment date of the previous classification, EPA does not make a determination as to whether the area failed to attain by the superseded attainment date.  In that circumstance, contingency measures will not be triggered and are therefore not necessary.  However, where, as here, EPA makes a determination that a State failed to attain by the applicable attainment date and thus the contingency measures are triggered by that determination, the subsequent mandatory reclassification of the nonattainment area does not negate a State's obligation to implement the triggered contingency measures associated with the previous classification's attainment plan.  In such a situation, the State is required to have contingency measures specifically to take effect automatically upon the determination of failure to attain.  Again, it would be illogical for the occurrence of the event requiring the triggering of the contingency measures to itself eliminate the requirement to have and implement such contingency measures.

Of course, a State cannot implement those contingency measures designed to help make up for the shortfall in emission reductions that led the State to fail to attain if the State does not have approved valid contingency measures in place.  But that does not mean that the State no longer has the obligation to develop and implement such measures "as soon as possible."  *See Delaney v. EPA*, 898 F.2d 687, 691 (9th Cir.

1990). Adoption and implementation of those measures, even if late, will serve the intended purpose of contingency measures, which is to provide additional emission reductions to help bridge the gap as the State works on the next required nonattainment plan to meet the requirements of the higher classification.

## B. The passage of the attainment deadline does not excuse Texas from developing and implementing contingency measures

Texas complains that it "makes little sense" to apply *Sierra Club* here because the attainment date for both areas has passed and thus, Texas argues, no contingency measure could now be truly prospective and conditional as required under *Sierra Club*. Pet's Br. at 32-35. These arguments fail.

It has long been the case under the CAA that once a statutory deadline has passed, and not been replaced by a later one, the deadline becomes "as soon as possible." *Delaney*, 898 F.2d at 691; *see also Coal. Against Columbus Ctr. v. New York*, 967 F.2d 764, 772 (2d Cir. 1992). Further, EPA has the authority to require States to make a SIP submission even after the passage of the applicable statutory submission deadline. *WildEarth Guardians v. EPA*, 830 F.3d 529, 540 (D.C. Cir. 2016) (statute still required States to submit Moderate area plan, so EPA authorized to establish a later date for such submission).

EPA recognizes that the timing of the *Sierra Club* decision creates an unusual circumstance. The statute contemplates that a State's SIP submission will come before the attainment deadline has passed. As EPA explained in its Rule, "[s]ituations

45

in which a State and EPA would have to address deficient contingency measures after the State had already failed to meet RFP or failed to attain should generally not occur." 88 Fed. Reg. at 67961. However, the appropriate course of action when that does happen is to address the deficiency – not to let a State shirk its responsibility to implement the additional measures Congress contemplated would be applied upon a failure to attain. EPA, reasonably, is not requiring retroactive or immediate implementation of these additional required measures, but stated that the State should develop them, submit them to EPA for inclusion into the SIP, and implement them "as soon as possible." Belated compliance is still compliance.

Texas's efforts to evade responsibility here based on the passage of time should not be rewarded. The attainment date is a deadline. Failure to meet that deadline triggers the requirement for contingency measures to go into effect. The fact that Texas failed to have—and failed to implement—contingency measures before the deadline does not alter Texas's obligations under the act to implement the additional measures Congress expected to be promptly implemented upon a failure to attain. *See Delaney*, 898 F.2d at 693 (finding "it would be anomalous for the EPA not to require as stringent measures for delinquent areas as for areas that qualified for extensions"). Texas was obligated to have contingency measures in place that would go into effect upon a failure to attain by the attainment date. Simply because the deadline for attainment has passed does not negate Texas's obligation to meet this requirement of the CAA.

### C. Texas is not excused from developing and implementing contingency measures because doing so is allegedly difficult

Texas claims that it is left with "no feasible options" that can be "swiftly implemented" and thus EPA's requirement that contingency measures be prospective and conditional should not apply here.[16] Pet's Br. at 36-37. However, under the model of cooperative federalism embodied by the CAA, the States – not EPA - have the primary obligation to develop measures that put them in compliance with the Act. *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016). Texas has provided no evidence that there is a complete absence of measures that could be implemented swiftly. Moreover, if Texas truly believes that it has no feasible measures that can be implemented swiftly, it still needs to document this lack of measures as part of a contingency measure submission, which it has not done.[17] The State's preferred alternative of simply skipping the contingency measures requirement and proceeding to develop a new area nonattainment plan to meet the Severe area attainment date of July 2027 ignores the statutory purposes of contingency measures entirely with respect to the Serious area nonattainment plan

---

[16] Notably, TCEQ did not raise these arguments in its comments on EPA's proposed rule.

[17] Even air agencies with extremely limited contingency measure options are typically able to provide a few contingency measures, along with justification as to why more are infeasible. *See, e.g,* Clean Air Plans; Contingency Measures for the Fine Particulate Matter Standards; San Joaquin Valley, California 88 Fed. Reg. 87988 (Dec. 20, 2023).

Texas asserts that EPA's strict adherence to the prospective and conditional requirement for contingency measures is "merely performative" and that it "unnecessarily limits the approvable emissions-reduction options" available to it. Pet's Br. at 36. In fact, the only limitation on Texas is that it must no longer rely on pre-existing emission reduction provisions to meet its contingency measures obligations.

Texas contends that its efforts should be limited to developing "truly contingent control measures" that could be applied to the Severe classification. But the statute requires Texas to develop valid measures for both classifications.

EPA recognizes and appreciates the difficulties States often face in developing required measures to bring areas into attainment, and EPA is willing to assist Texas and often works closely with its State partners in developing approvable SIPs. As it has made clear, EPA is "available to assist Texas" to work to develop "approvable contingency plans" for ozone reductions that are "consistent with the statute." 88 Fed. Reg. at 67961.

# CONCLUSION

For the foregoing reasons, the Court should deny this petition.

Dated:  April 22, 2024

Of Counsel:

Corin James
Office of General Counsel
Washington D.C.

Joshua Olszewski
Region 6
Dallas, TX

*United States Environmental
Protection Agency*

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

*s/ Benjamin J. Grillot*
BENJAMIN J. GRILLOT
U.S. Department of Justice
Environment and Natural Resources
Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0303

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 11,893 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Garamond.

Dated:  April 22, 2024        */s/ Benjamin J. Grillot*
                                          Benjamin J. Grillot

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system which serves all noticed counsel in this matter.

Dated:  April 22, 2024                    */s/  Benjamin J. Grillot*
                                          Benjamin J. Grillot