No. 23-60616

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL
S. REGAN, ADMINISTRATOR OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

Respondents.


On Petition for Review of Final Action by the
United States Environmental Protection Agency


**INTERVENOR-RESPONDENT SIERRA CLUB'S BRIEF**

Seth L. Johnson
Molly Prothero
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
202-797-5245
202-770-3974
sjohnson@earthjustice.org
mprothero@earthjustice.org

*Counsel for Sierra Club*

Filed: April 29, 2024

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Petitioners: State of Texas; and Texas Commission on Environmental Quality.

2. Counsel for State of Texas and Texas Commission on Environmental Quality: Ken Paxton, Attorney General; Brent Webster, First Assistant Attorney General; James Lloyd, Deputy Attorney General for Civil Litigation; Bill Davis, Deputy Solicitor General; Kellie E. Billings-Ray, Chief, Environmental Protection Division; Erin K. Snody, Assistant Attorney General; John R. Hulme, Assistant Attorney General, all with the Office of the Attorney General for the State of Texas.

3. Respondents: United States Environmental Protection Agency; Michael S. Regan, Administrator, U.S. Environmental Protection Agency.

4. Counsel for Respondents: Merrick Garland, Attorney General; Todd Sunhwae Kim, Assistant Attorney General; and Benjamin Grillot, Attorney, all with the U.S. Department of Justice.

5. Amici Curiae: Texas Oil & Gas Association; Texas Chemistry Council; and Business Coalition for Clean Air.

6. Counsel for Amici Curiae: Aaron M. Streett; Matthew L. Kuryla; and Beau Carter, all with Baker Botts L.L.P.

7. Intervenor: Sierra Club is a non-profit organization that maintains open membership invitation to organizations, businesses, individuals, and the public in general. Accordingly, Sierra Club consists of many individual members.

Sierra Club has no parent companies, and no publicly-held company owns a 10% or greater interest in Sierra Club.

8.  <u>Counsel for Intervenor</u>: Seth L. Johnson and Molly Prothero, both with Earthjustice.

Respectfully submitted,

*/s/ Seth L. Johnson*
Seth L. Johnson

## STATEMENT REGARDING ORAL ARGUMENT

Intervenor-Respondent Sierra Club respectfully requests oral argument. The three sets of parties in this case have differing perspectives on some of the more complex issues presented here, and Sierra Club submits that the Court is likely to benefit from holding oral argument in this case.

*/s/ Seth L .Johnson*
Seth L. Johnson

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

STATEMENT OF ISSUES ........................................................................1

STATEMENT OF THE CASE....................................................................2

I. OZONE POLLUTION HARMS HUMAN HEALTH AND ECOSYSTEMS.......................................................................................3

II. THE CLEAN AIR ACT INCLUDES A CAREFULLY DETAILED, NATIONALLY CONSISTENT APPROACH TO CONTROL DANGEROUS OZONE LEVELS. ............................................................5

III. OZONE POLLUTION IS A SERIOUS, LONGSTANDING PROBLEM IN THE HOUSTON AND DALLAS AREAS. ...................9

A. THESE AREAS HAVE SOME OF THE WORST OZONE POLLUTION IN THE COUNTRY. ...............................................9

B. THE DALLAS AND HOUSTON AREAS' OZONE POLLUTION LEVELS HAVE PERSISTENTLY VIOLATED THE CLEAN AIR ACT..........................................................................................10

IV. EPA FINALLY REQUIRES CONTINGENCY MEASURES THAT GENERATE NEW POLLUTION REDUCTIONS AND BENEFITS FOR PEOPLE, INCLUDING TEXANS. .........................................................12

A. FOR DECADES, EPA ALLOWED CONTINGENCY MEASURES THAT PROVIDED NO NEW POLLUTION REDUCTIONS WHEN CONTINGENCY-TRIGGERING EVENTS OCCURRED.........................12

B. RECENT LITIGATION FORCES EPA TO FOLLOW THE ACT'S REQUIREMENTS AND DISAPPROVE TEXAS'S ILLEGAL CONTINGENCY MEASURES. ................................................14

SUMMARY OF ARGUMENT.................................................................15

ARGUMENT ........................................................................................17

I. ISSUE PRECLUSION REQUIRES DENYING TEXAS'S PETITION..........................................................................................17

II.     THIS COURT SHOULD UPHOLD EPA'S FINAL RULE. .........................22

A.     THE ACT UNAMBIGUOUSLY BARS ALREADY-
IMPLEMENTED CONTINGENCY MEASURES. ....................................23

    1.     The Act's plain text requires future-facing and conditional
contingency measures. .........................................................................23

    2.     The Act's statutory history confirms that EPA had to disapprove
already-implemented contingency measures. ....................................26

    3.     This Court should overrule *LEAN*. ......................................................27

B.     UNDER THE RULE OF LAW, EPA MUST COMPLY WITH *SIERRA
CLUB* AND ITS OWN REGULATIONS. .....................................................31

C.     PETITIONERS' OTHER ARGUMENTS ARE MERITLESS. ....................34

III.    WERE IT APPROPRIATE TO GRANT RELIEF, THE FINAL RULE
SHOULD BE REMANDED WITHOUT VACATUR.............................................37

CONCLUSION .......................................................................................................39

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ..................41

CERTIFICATIONS UNDER ECF FILING STANDARDS...................................41

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Affholder, Inc. v. Southern Rock, Inc.*,
746 F.2d 305 (5th Cir. 1984) ............................................................31

*Am. Trucking Ass'ns v. EPA*,
283 F.3d 355 (D.C. Cir. 2002).................................................3, 4, 5

*Associated Recovery L.L.C. v. Does 1-44*,
769 F. App'x 160 (5th Cir. 2019) ...................................................19

*B&B Hardware v. Hargis Industries*,
575 U.S. 138 (2015)......................................................17, 18, 19, 21

*Bahr v. EPA*,
836 F.3d 1218 (9th Cir. 2016) ......................................14, 24, 28, 30

*Black Warrior Riverkeeper v. U.S. Army Corps of Engineers*,
781 F.3d 1271 (11th Cir. 2015) .......................................................39

*Central & S.W. Services v. EPA*,
220 F.3d 683 (5th Cir. 2000) ...........................................................38

*Chevron USA Inc. v. NRDC*,
467 U.S. 837 (1984).........................................................14, 28, 29

*Clark v. Martinez*,
543 U.S. 371 (2005)............................................................................33

*Contender Farm, L.L.P. v. USDA*,
779 F.3d 258 (5th Cir. 2015) ...........................................................29

*Dodd v. United States*,
545 U.S. 353 (2005)............................................................................25

*Dornbusch v. CIR*,
860 F.2d 611 (5th Cir. 1988) ...........................................................31

*EME Homer City Generation v. EPA*,
795 F.3d 118 (D.C. Cir. 2015).........................................................36

*Ethyl Corp. v. EPA,*
 51 F.3d 1053 (D.C. Cir. 1995)..........................................................30

*Federated Dept. Stores v. Moitie,*
 452 U.S. 394 (1981)........................................................................21

*Gallagher v. Wilton Enterprises,*
 962 F.2d 120 (1st Cir. 1992)...........................................................31

*George v. McDonough,*
 596 U.S. 740 (2022).........................................................................36

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Service,*
 968 F.3d 454 (5th Cir. 2020) ..........................................................30

*Harper v. Virginia Dept. of Taxation,*
 509 U.S. 86 (1993)...........................................................................36

*Helix Energy Solutions Group v. Hewitt,*
 143 S. Ct. 677 (2023).......................................................................32

*Irons v. Diamond,*
 670 F.2d 265 (D.C. Cir. 1981).........................................................31

*Kariuki v. Tarango,*
 709 F.3d 495 (5th Cir. 2013) ..........................................................20

*Kennecott Corp. v. EPA,*
 684 F.2d 1014 (D.C. Cir. 1982).......................................................34

*Knapp v. USDA,*
 796 F.3d 445 (5th Cir. 2015) .....................................................35, 36

*Lauderdale-El v. Indiana Parole Bd.,*
 35 F.4th 572 (7th Cir. 2022) ...........................................................31

*Louisiana Environmental Action Network v. EPA,*
 382 F.3d 575 (5th Cir. 2004) ................... 13, 14, 27, 28, 29, 30, 33, 34

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA,*
 891 F.3d 1041 (D.C. Cir. 2018)..............................................8, 31, 32

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
  414 U.S. 453 (1974)................................................................29

*NRDC v. EPA*,
  749 F.3d 1055 (D.C. Cir. 2014)................................................30

*O'Reilly v. U.S. Army Corps of Engineers*,
  477 F.3d 225 (5th Cir. 2007) ..................................................38

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979)................................................................20

*Petro-Hunt, L.L.C. v. United States*,
  365 F.3d 385 (5th Cir. 2004) ..................................................20

*Railway Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
  29 F.3d 655 (D.C. Cir. 1994) (en banc)..................................30

*Reynoldsville Casket Co. v. Hyde*,
  514 U.S. 749 (1995)................................................................36

*Santopadre v. Pelican Homestead & Sav. Ass'n*,
  937 F.2d 268 (5th Cir. 1991) ............................................18, 19

*Shipping Corp. of India. v. Jaldhi Overseas Pte Ltd.*,
  585 F.3d 58 (2d Cir. 2009) .....................................................31

*Sierra Club v. EPA*,
  21 F.4th 815 (D.C. Cir. 2021)..................... 14, 15, 17, 18, 19, 21, 24, 25, 28, 30

*Sierra Club v. EPA*,
  No. 20-1229 (D.C. Cir. Dec. 17, 2021) ..................................32

*Sierra Club v. EPA*,
  60 F.4th 1008 (6th Cir. 2023) .................................................39

*South Coast Air Quality Mgmt. Dist. v. EPA*,
  472 F.3d 882 (D.C. Cir. 2006), *amended in part on reh'g* 489 F.3d
  1245 (D.C. Cir. 2007) .......................................................6, 7, 27

*Students for Fair Admissions, Inc. v. University of Texas at Austin*,
  37 F.4th 1078 (5th Cir. 2022) ............................................8, 31

*Texas v. EPA*,
2011 WL 710598 (5th Cir. 2011) ............................................................8

*United Services Auto. Ass'n v. Perry*,
102 F.3d 144 (5th Cir. 1996) ..............................................................17

*United States ex rel Gage v. Rolls-Royce North America*,
760 F. App'x 314 (5th Cir. 2019) .......................................................18

*United States v. Flores*,
664 F. App'x 395 (5th Cir. 2016) .......................................................25

*United States v. Mead Corp.*,
533 U.S. 218 (2001)...........................................................................34

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001)...........................................................................39

*United States v. Stauffer Chem. Co.*,
464 U.S. 165 (1984)...........................................................................20

*United States v. Taylor*,
142 S. Ct. 2015 (2022).......................................................................26

*Utility Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014)...........................................................................25

*Venetian Casino Resort, L.L.C. v. NLRB*,
484 F.3d 601 (D.C. Cir. 2007)...........................................................19

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)........................................................................6, 27

**Statutes**

42 U.S.C. § 7401(b)(1).............................................................................5

42 U.S.C. § 7407(d)(1)(A) .......................................................................5

42 U.S.C. § 7407(d)(1)(B) .......................................................................5

42 U.S.C. § 7408(a)..................................................................................5

42 U.S.C. § 7409 ...........................................................................5

42 U.S.C. § 7410 ...........................................................................5

42 U.S.C. § 7410(a) .....................................................................5, 6

42 U.S.C. § 7410(c) .........................................................................6

42 U.S.C. § 7410(k) .........................................................................6

42 U.S.C. § 7412(b)(1) .....................................................................4

42 U.S.C. § 7502 .......................................................................5, 6, 7

42 U.S.C. § 7502(c) .................................................................7, 25, 32

42 U.S.C. § 7502(c)(9) .............................................................7, 24, 26

42 U.S.C. §§ 7511-7511f ...........................................................6, 27

42 U.S.C. § 7511 ..........................................................................6, 27

42 U.S.C. § 7511(a)(1) ...........................................................6, 7, 26

42 U.S.C. § 7511(a)(1) & tbl.1 ......................................................6, 7

42 U.S.C. § 7511a(a) ......................................................................24

42 U.S.C. § 7511a(c)(9) ...........................................................7, 24, 32

42 U.S.C. § 7601(a)(2) ....................................................................34

42 U.S.C. § 7601(a)(2)(A) .................................................................8

42 U.S.C. § 7607(b)(1) ...........................................................8, 15, 34

**Prior Statutes**

42 U.S.C. § 7502(c)(9) (1990) .........................................................7

**Regulations**

40 C.F.R. § 51.100(s) .......................................................................4

[40 C.F.R. § 51.1103(a)](#) & tbl.1 .................................................................[7](#)

[40 C.F.R. §§ 56.1-.5](#) ........................................................................8

[40 C.F.R. § 56.3](#) .............................................................................34

[40 C.F.R. § 56.3(d)](#) .................................................................8, 14, 31

**Federal Register Notices**

63 FR 8,128 (Feb. 18, 1998) ..................................................................11

72 FR 74,252 (Dec. 31, 2007) ...............................................................11

73 FR 56,982 (Oct. 1, 2008) ..................................................................11

75 FR 79,302 (Dec. 20, 2010) ...............................................................11

77 FR 36,400 (June 19, 2012) ...............................................................11

80 FR 65,292 (Oct. 26, 2015) ..........................................................3, 4, 5

83 FR 17,226 (Apr. 18, 2018) ...................................................................4

83 FR 19,483 (May 3, 2018) ...................................................................13

83 FR 49,297 (Oct. 1, 2018) ..................................................................13

83 FR 62,998 (Dec. 6, 2018) ..................................................................14

84 FR 3,708 (Feb. 13, 2019) ..................................................................13

85 FR 23,700 (Apr. 28, 2020) ................................................................32

87 FR 60,897 (Oct. 7, 2022) ..................................................................12

87 FR 60,926 (Oct. 7, 2022) ..................................................................12

88 FR 67,957 (Oct. 3, 2023) ............................................................15, 33

**Rules**

[Fed. R. App. P. 35(a)](#) ...................................................................28, 30

Fed. R. App. P. 35(b) ...................................................................30

Fed. R. App. P. 35(b)(1) ...............................................................28

**Legislative History**

1 A Legislative History of the Clean Air Act Amendments of 1990
  (1993) ...................................................................................27

**INTRODUCTION**

Though the Houston and Dallas areas have repeatedly failed to meet healthy air standards for ozone, Texas has evaded implementing legally required additional pollution reductions under the Clean Air Act's ("the Act's") "contingency measures" provisions. For decades, it did so because EPA took an illegal approach to contingency measures. But with the agency's position repeatedly rejected by courts—including a decision that binds EPA nationally and to which Texas and the Texas Commission on Environmental Quality ("Petitioners" or "Texas") were parties—EPA has now finally required Texas to develop lawful contingency measures that will bring relief to residents of the ozone-plagued Dallas and Houston areas. Texas objects, but EPA followed the Act's plain text in disapproving Texas's proposed contingency measures. With this case, Texas asks for a second bite at the apple and seeks special treatment, claiming EPA should have acted contrary to the Act, binding precedent, and EPA's own regulations. Texas's petition should be denied.

**STATEMENT OF ISSUES**

1.  The doctrine of issue preclusion bars parties from relitigating questions of law that have already been decided against them. Petitioners here were parties to a D.C. Circuit case that held that the Act requires contingency measures to start operating when triggered, not before; they cannot be

1

already-implemented measures. Texas now sues in this Court, arguing that already-implemented contingency measures do not violate the Act. Is Petitioners' argument precluded?

2. The Act requires states to include in their implementation plan submissions "contingency measures"—"specific measures to be undertaken if" an area fails to attain its required pollution reductions by its deadline. Did EPA appropriately disapprove Texas's plan submissions because they included already-implemented measures that would not lead to additional pollution reductions, rather than measures that actually depend on the occurrence of a contingency?

3. Remand without vacatur is the typical remedy where an agency likely can substantiate its decision upon remand and where vacatur would be disruptive. If this Court found relief appropriate, should the rule under review be remanded without vacatur?

## STATEMENT OF THE CASE

Because ground-level ozone seriously harms human health, the Act includes a carefully calibrated scheme for bringing unhealthy ozone levels into compliance with national standards. As part of that scheme, Congress recognized that plans to reduce harmful levels of ozone air pollution might not succeed. Accordingly, it required states to develop "contingency measures" to kick in automatically if

polluted areas failed to make legally required pollution reductions. But for decades, EPA defanged these measures by allowing them to consist of pollution control measures that were implemented before any contingency might occur, often referred to as "already-implemented measures." EPA defended its position for decades, too, including in this Court 20 years ago and, more recently, in a nationally applicable rule it adopted in 2018. Sierra Club and other groups challenged the 2018 rule in the D.C. Circuit. Texas intervened in support of EPA. EPA vigorously defended its position. In 2021, the D.C. Circuit ruled that EPA's position on contingency measures violated the Act. EPA then changed its position and ultimately disapproved Texas's submissions of contingency measures that consisted of already-implemented measures. Texas now challenges EPA's disapproval action, seeking its vacatur.

## I.    OZONE POLLUTION HARMS HUMAN HEALTH AND ECOSYSTEMS.

Ozone, the main component of urban smog, is a corrosive air pollutant that inflames the lungs, constricts breathing, causes asthma attacks and other health harms serious enough to send people to the emergency room or hospital, and can cause death. *See Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 359 (D.C. Cir. 2002); 80 FR 65,292, 65,306/1-09/1 (Oct. 26, 2015); EPA, Policy Assessment ("PA"),

EPA-HQ-OAR-2008-0699-0404[1] at 3-18, 3-26 to -29, 3-32; Integrated Science

Assessment, EPA-HQ-OAR-2008-0699-0405 at 2-16 to -18, 2-20 to -24 tbl.2-1.

Ozone is not emitted directly into the atmosphere, but results from the reaction of

precursor chemicals—primarily volatile organic compounds and oxides of

nitrogen—with sunlight in the atmosphere. *Am. Trucking*, 283 F.3d at 359. Volatile

organic compounds and oxides of nitrogen are themselves harmful air pollutants;

for example, volatile organic compounds include listed hazardous air pollutants

like benzene, toluene, and formaldehyde,[2] and oxides of nitrogen cause similar

respiratory problems as ozone does. *See, e.g.*, 83 FR 17,226, 17,233/3-35/2 (Apr.

18, 2018).

Ozone can harm healthy adults, but others are more vulnerable. *See* 80 FR

65,310/1-3. Because children's respiratory tracts are not fully developed, they are

especially vulnerable to ozone pollution, particularly when they have elevated

respiratory rates, like when playing outdoors. *E.g.*, PA 3-81 to -82. People with

---

[1] The documents referred to by EPA docket numbers like these are available at
www.regulations.gov.

[2] *See* 40 C.F.R. § 51.100(s) (defining volatile organic compound as "any
compound of carbon, excluding [certain compounds], which participates in
atmospheric photochemical reactions"); EPA, Technical Overview of Volatile
Organic Compounds, http://www.epa.gov/indoor-air-quality-iaq/technical-
overview-volatile-organic-compounds (discussing benzene, formaldehyde, and
toluene as example volatile organic compounds); 42 U.S.C. § 7412(b)(1) (listing
all three compounds as hazardous air pollutants).

lung disease and the elderly also have heightened vulnerability. *See* 80 FR 65,310/3. People with asthma suffer more severe impacts from ozone exposure than healthy individuals and are more vulnerable at lower levels of exposure. *Id.* 65,311/1 n.37, 65,322/3.

## II. THE CLEAN AIR ACT INCLUDES A CAREFULLY DETAILED, NATIONALLY CONSISTENT APPROACH TO CONTROL DANGEROUS OZONE LEVELS.

The Act's central purpose is to protect public health and welfare. 42 U.S.C. § 7401(b)(1). To that end, it requires that all areas in the country comply with health-based national ambient air quality standards ("standards" or "NAAQS") set by EPA, which reflect the maximum permissible levels of common pollutants in the ambient air, one of which is ground-level ozone. *Id*. §§ 7408-7410.

Once EPA establishes NAAQS, the Act provides a detailed framework for how states must attain—and remain in—compliance with each air quality standard. This starts with initial area air quality designations. *See Am. Trucking*, 283 F.3d at 358-59. EPA promulgates designations of all areas as either violating the standard ("nonattainment" areas) or meeting the standard ("attainment" areas). 42 U.S.C. § 7407(d)(1)(A)-(B). States with nonattainment areas must then develop "state implementation plans" (also called "SIPs") to achieve compliance with the NAAQS and other statutory requirements. *E.g.*, *id.* §§ 7410(a), 7502. EPA plays

the critical oversight role of ensuring submitted implementation plans meet the Act's requirements before approving them into federal law. *Id.* §§ 7410(a), (k).

At issue here is regulation of ozone in nonattainment areas. In 1990, Congress drastically amended the Act's nonattainment provisions to be more effective and prescriptive, especially for ozone. It did so because the prior, "discretion-filled approach" had failed—the ozone problem was actually worsening. *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886-87 (D.C. Cir. 2006), *amended in other part on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 484-85 (2001) (1990 Amendments "eliminate[] regulatory discretion that [was previously] allowed …. The EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion.").

Congress accordingly created a detailed program to ensure that air quality will attain ozone standards by specified deadlines ("attainment deadlines"). 42 U.S.C. §§ 7410(a), (c), 7502; *see also id.* §§ 7511-7511f (provisions specific to ozone nonattainment areas). Under Congress's program, simultaneously with their designation, ozone nonattainment areas must be classified based on the severity of their ozone pollution levels as "marginal," "moderate," "serious," "severe," or "extreme." *Id.* § 7511(a)(1) & tbl.1. The higher the classification, the longer the area may take to come into attainment, but the more stringent the controls it must

adopt into its state implementation plan. *South Coast*, 472 F.3d at 887. If an area fails to attain timely, EPA must reclassify it to a higher classification, triggering stronger pollution control requirements. *Id.* 887-88; 42 U.S.C. § 7511(a)(1) & tbl.1 (statutory attainment deadlines); *see also, e.g.*, 40 C.F.R. § 51.1103(a) & tbl.1 (translating statutory attainment deadlines for 2008 ozone standard).

In 1990,[3] Congress added contingency measures as a vital part of its regulatory scheme. Areas of at least certain classifications must adopt "contingency measures" that "provide for the implementation of specific measures to be undertaken," and these measures are "to take effect" "without further action by the State or the Administrator," when a nonattainment area "fails to meet any applicable milestone" or to attain the standard on time. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9). These measures create a mechanism to ensure polluted areas that do not sufficiently reduce pollution get back on track to make "reasonable further progress" and eventually comply with the ozone standard. *Id.* § 7502(c)(9).

As well as enacting these directly health-focused provisions, Congress also took care to promote consistent implementation and interpretation of the Act across the country. Congress directed EPA to promulgate regulations "designed" "to

---

[3] Texas suggests (at 9 n.3) Congress required contingency measures before 1990. That suggestion appears erroneous, for prior versions of 42 U.S.C. § 7502 said nothing about any contingency measures requirement. *See* 42 U.S.C. § 7502 (1990).

assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the [Act]." 42 U.S.C. § 7601(a)(2)(A); *see also* 40 C.F.R. §§ 56.1-.5 (EPA's promulgated regulations). Similarly, to ensure uniformity and centralize review of national Clean Air Act issues, the Act's venue provision directs judicial review of final EPA actions that are "nationally applicable" exclusively to the D.C. Circuit. 42 U.S.C. § 7607(b)(1); *see Texas v. EPA*, 2011 WL 710598, *3 (5th Cir. 2011). Under both basic principles of rule of law and EPA's regulations, D.C. Circuit decisions regarding nationally applicable EPA final actions bind the agency nationally. *See Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 891 F.3d 1041, 1048 (D.C. Cir. 2018) ("[T]he Administrator cannot defy a controlling federal court decision in any EPA region that falls within that court's jurisdiction.") ("*NEDACAP II*"); 40 C.F.R. § 56.3(d) ("the decisions of the U.S. Supreme Court and decisions of the U.S. Court of Appeals for the D.C. Circuit Court that arise from challenges to 'nationally applicable regulations…or final action,'…shall apply uniformly" (first alteration in original)); *see also Students for Fair Admissions, Inc. v. University of Texas at Austin*, 37 F.4th 1078, 1087 (5th Cir. 2022) ("[A] court's judgment binds…the parties to a suit.") (citation omitted); *NEDACAP II*, 891 F.3d at 1050 (agreeing with EPA's "longstanding position that…decisions of th[e D.C. Circuit]

that arise from challenges to nationally applicable regulations or final agency action would necessarily apply uniformly").

### III. OZONE POLLUTION IS A SERIOUS, LONGSTANDING PROBLEM IN THE HOUSTON AND DALLAS AREAS.

#### A. These areas have some of the worst ozone pollution in the country.

The Houston-Galveston-Brazoria ("Houston area") and Dallas-Fort Worth ("Dallas area") areas have dangerous ozone levels. Per the American Lung Association, the Houston area has the tenth most ozone pollution of metro areas in the nation. American Lung Association, State of the Air 2024, *Most Polluted Cities* (last visited Apr. 29, 2024), https://www.lung.org/research/sota/city-rankings/most-polluted-cities. The Dallas area ranks 13th. *Id*. They also have elevated risk for related air pollutants. EPA's Environmental Justice Screening Tool ("EJScreen") Analysis for the action at issue here finds at least parts of both the Houston and Dallas areas exceed the 80th percentile in the country and the 80th percentile in Texas for air toxics cancer risk. C.I.5 at 2, 4. Both areas also exceed the 80th percentile in Texas on the air toxics respiratory hazard index. *Id*.

The risks of ozone pollution are not spread equally. Although people of color make up 41.6% of the U.S. population, "[i]n the counties with the worst air quality…63% of the nearly 44 million residents are people of color, compared to 37% who are white." American Lung Association, State of the Air 2024, *Key*

*Findings* (last visited Apr. 29, 2024), https://www.lung.org/research/sota/key-findings. This disparate health impact occurs in Texas as well. For example, the Joppa neighborhood in southern Dallas is a predominantly Black community. Data from EJ Screen reveals that residents of Joppa experience greater ozone levels and hazards from air pollutants than the average Texas or U.S. resident does. EPA, EJScreen, https://ejscreen.epa.gov/mapper/ (search for "Joppa Cir, Dallas, TX," click on "Reports," click on "Select Block Group," click on map, click on "EJScreen Community Report"). In addition to being 99% people of color, 60% of Joppa's population is low-income. *Id.* Average life expectancy in Joppa is a full 13 years less than for people living in Highland Park, a Dallas community that is over 91% white and with a median income of nearly $250,000. *See* Noelle Walker, *"Now or Never" Severe Emissions Cuts Are Essential to Climate Change Reform, Experts Say*, NBC DFW (Apr. 4, 2022), https://www.nbcdfw.com/news/local/joppa-environmental-study-nears-end-of-first-phase/2931923/; *QuickFacts: Highland Park town, Texas*, U.S. Census Bureau (last accessed Apr. 29, 2024), https://www.census.gov/quickfacts/fact/table/highlandparktowntexas/PST045223.

## B. The Dallas and Houston areas' ozone pollution levels have persistently violated the Clean Air Act.

This case pertains to violations of the 2008 standard, but both the Houston and Dallas areas have a history of violations dating back to the 1979 ozone

standard. *See Dallas-Fort Worth: Ozone History*, Texas Commission on Environmental Quality (last modified Oct. 10, 2023), https://www.tceq.texas.gov/airquality/sip/dfw/dfw-ozone-history; *Houston-Galveston-Brazoria: Ozone History*, Texas Commission on Environmental Quality (last modified Nov. 1, 2023), https://www.tceq.texas.gov/airquality/sip/hgb/hgb-ozone-history. Under that standard, both the Houston and Dallas areas were designated nonattainment, with Houston classified as "severe" and Dallas as "moderate." *Houston-Galveston-Brazoria: Ozone History*; *Dallas-Fort Worth: Ozone History*. Both areas failed to meet their attainment deadlines. 77 FR 36,400 (June 19, 2012) (Houston); 63 FR 8,128 (Feb. 18, 1998) (Dallas).

When EPA promulgated the 1997 ozone standard, both areas violated it and were designated nonattainment. *Dallas-Fort Worth: Ozone History*; *Houston-Galveston-Brazoria: Ozone History*. The Dallas area missed its attainment deadline under that standard and was reclassified from moderate to serious nonattainment. 75 FR 79,302 (Dec. 20, 2010). Because Texas anticipated missing Houston's moderate area attainment deadline, it had EPA reclassify the area to severe nonattainment. 73 FR 56,982 (Oct. 1, 2008); 72 FR 74,252, 74,253/2 (Dec. 31, 2007).

The pattern of unhealthy air and missed cleanup deadlines has continued under the newest ozone standards. Under the 2008 ozone standard, both the

Houston and Dallas areas failed to meet several attainment deadlines and were ultimately reclassified as severe nonattainment in 2022. *Houston-Galveston-Brazoria: Ozone History*; *Dallas-Fort Worth: Ozone History*; 87 FR 60,926 (Oct. 7, 2022). As for the most recent, 2015, ozone standard, both areas were reclassified as moderate nonattainment with an August 2024 attainment deadline after failing to meet the original 2021 attainment deadline. 87 FR 60,897 (Oct. 7, 2022).

## IV. EPA FINALLY REQUIRES CONTINGENCY MEASURES THAT GENERATE NEW POLLUTION REDUCTIONS AND BENEFITS FOR PEOPLE, INCLUDING TEXANS.

As explained above, Congress required states to develop contingency measures to ensure polluted areas clean up the air for their residents. But this congressional requirement is finally being implemented as Congress wrote it only after EPA lost multiple court cases, including one that applies nationally and to which Texas was a party, where EPA argued for toothless contingency measures.

### A. For decades, EPA allowed contingency measures that provided no new pollution reductions when contingency-triggering events occurred.

Despite the Act's plain text and statutory history, until recently, EPA claimed authority to permit contingency measure requirements to be met by including measures that had already been implemented before the contingency occurred. Thus, even though an area failed to make legally required air quality improvement, contingency measures needed to do nothing additional. Instead,

areas could point to measures they were already taking to satisfy any contingency requirements.

EPA's historical interpretation reduced contingency measures to a mere accounting exercise. For example, to satisfy underlying statutory emission reduction requirements, some states relied on cleaner vehicles replacing dirtier ones, then counted as their contingency measures any emission reductions beyond the amounts the states projected to be necessary to meet the underlying emission reduction requirements. *E.g.*, Opening Br. of Pet'rs ("Pet.") 12-13 (describing purported contingency measures at issue here); 83 FR 49,297 (Oct. 1, 2018) (approving Connecticut's contingency measures); EPA-R01-OAR-2016-0168-0022 at 117 (Connecticut proposes its "contingency plan requirement will be met by using a portion of the projected…emission reductions occurring between 2011 and 2017 from federal standards for non-road engines and equipment"). Indeed, Texas submitted several already-implemented measures as contingency measures. *E.g.*, 84 FR 3,708, 3,709/3 (Feb. 13, 2019); 83 FR 19,483, 19,494/2-3 (May 3, 2018).

This Court found the Act's contingency measures provisions ambiguous and upheld EPA's position that the requirement mandated nothing additional from nonattainment areas. *Louisiana Environmental Action Network v. EPA*, 382 F.3d 575, 582-84 (5th Cir. 2004) ("*LEAN*"). To find the Act ambiguous, the *LEAN*

Court relied on the Act's not expressly speaking to whether "continuing emissions reductions" could be contingency measures, even though it found the Act's "plain" language would "seemingly preclude" reliance on already-implemented measures. *Id.* 583 (emphasis removed). The *LEAN* Court neither found EPA's interpretation to be the best interpretation of the Act, nor did it defer to it under *Chevron USA Inc. v. NRDC*, 467 U.S. 837 (1984); rather, the Court found it "persuasive." *LEAN*, 382 F.3d at 583-84. Texas and Sierra Club were not parties in *LEAN*.

## B. Recent litigation forces EPA to follow the Act's requirements and disapprove Texas's illegal contingency measures.

Only after more recent litigation did the agency begin requiring contingency measures that comply with the Act's text. In 2016, the Ninth Circuit held that "'contingency measures' are control measures that will be implemented in the future, and the statutory language is not susceptible to multiple interpretations." *Bahr v. EPA*, 836 F.3d 1218, 1235 (9th Cir. 2016). EPA declined to follow *Bahr* outside the Ninth Circuit, as its regulations permit. 83 FR 62,998, 63,026/2-3 (Dec. 6, 2018); 40 C.F.R. § 56.3(d).

Sierra Club later sued in the D.C. Circuit over EPA's nationally applicable rules governing implementation of the 2015 ozone standard in all nonattainment areas, and, among other issues, challenged the contingency measures provision. *Sierra Club v. EPA*, 21 F.4th 815, 816-17 (D.C. Cir. 2021). Petitioners here were

parties to the D.C. Circuit case; they intervened in support of EPA. *See Sierra Club*, 21 F.4th 815. The D.C. Circuit held the Act unambiguously requires "that previously implemented measures cannot qualify as contingency measures." *Id*. at 827. Because this holding was issued by the D.C. Circuit, the only circuit court with authority to hear challenges to nationally applicable EPA clean air rules, the ruling was nationally applicable. *See* 42 U.S.C. § 7607(b)(1). Neither Petitioner sought rehearing or petitioned for a writ of certiorari to the Supreme Court after the D.C. Circuit's decision.

Now, Texas seeks to relitigate the issue decided in *Sierra Club* by challenging EPA's final rule disapproving Texas's contingency measures for the Dallas and Houston areas. After failing to attain the 2008 ozone standard, Texas submitted a SIP that identified only "emission reductions from already-implemented mobile source measures" to purport to meet the contingency measures requirement 88 FR 67,957, 67,957/3 (Oct. 3, 2023) ("Final Rule"). Its historical approach invalidated nationally, EPA at last followed the Clean Air Act's mandate by disapproving Texas's contingency measure provisions.

## SUMMARY OF ARGUMENT

Issue preclusion bars Texas's petition. Petitioners have already had their day in court on the issue of contingency measures—and they lost. They now seek to relitigate the same issue. They are bound by their prior litigation. Further,

considerations of public policy, judicial economy, and fairness all confirm this Court should deny the petition.

Even if Petitioners were not precluded, their petition fails on the merits. The Act's text required EPA to disapprove Texas's SIP's contingency measures provision. The agency had no discretion to make an alternate determination; EPA must follow the Act's requirements nationwide. Here, Texas seeks to be treated differently from the rest of the country, no matter the detriment to its residents who have been and continue to be exposed to illegal levels of ozone pollution. Petitioners rely heavily on this Court's decision in *LEAN* to the exclusion of the Act's plain text, structure, and statutory history, EPA's regulations, and other relevant case law. *LEAN* contradicts the Act's plain text and this Court's precedent on statutory interpretation, and thus should be overruled.

The petition for review should be denied. But if this Court were to find relief appropriate, it should remand the Final Rule without vacatur. EPA could substantiate its decision on remand. Further, this Court's equitable power supports this approach; remand without vacatur would better protect Texans from the harms of unmitigated air pollution as EPA promulgates a new rule.

**ARGUMENT**

## I.  ISSUE PRECLUSION REQUIRES DENYING TEXAS'S PETITION.

Texas's (at 31-32) and Amici's (at 14-15) focus on whether this Court is bound by the D.C. Circuit's *Sierra Club* decision misses the point: Texas is bound by it. *See United Services Auto. Ass'n v. Perry*, 102 F.3d 144, 146 & n.3 (5th Cir. 1996). Vigorously litigated directly on the issue, *Sierra Club* holds expressly that "previously implemented measures cannot qualify as contingency measures": "valid contingency measures become operative only when the triggering conditions set forth in the statute occur, and not any earlier." 21 F.4th at 827. Texas neglects to mention that Petitioners here were parties to *Sierra Club*. They intervened in support of EPA. *Id*. Now, they attempt to relitigate the D.C. Circuit's final ruling in this Court. Their argument is barred by issue preclusion.

Under issue preclusion, also called collateral estoppel, this petition must be denied because Texas seeks to relitigate a legal issue that was decided against it and that was core to the decision in *Sierra Club*, a case to which it was a party. *B&B Hardware v. Hargis Industries*, 575 U.S. 138, 148 (2015). Specifically, the "issue of…law" of whether already-implemented measures can lawfully be contingency measures under the Act was "actually litigated and determined by a valid and final judgment" in *Sierra Club*, and that determination was unquestionably "essential to the judgment." *Id.* (quoting Restatement (Second) of

Judgments § 27, p.250 (1980)). Accordingly, that determination is "conclusive in a subsequent action" like this one "between the parties, whether on the same or a different claim." *Id.* (same) (emphasis added); *see also United States ex rel Gage v. Rolls-Royce North America*, 760 F. App'x 314, 317 (5th Cir. 2019).

Indeed, the question of what the Act's contingency measures provisions require was "put in issue by the pleadings, and [wa]s submitted…for its determination, and [wa]s determined" in *Sierra Club*, which indisputably was a final and valid judgment. *Santopadre v. Pelican Homestead & Sav. Ass'n*, 937 F.2d 268, 273 (5th Cir. 1991) (defining when issue has been actually litigated);[4] *see Sierra Club*, 21 F.4th at 827-28 (summarizing contingency measures issue and ruling on it). And *Sierra Club*'s contingency measures determination was plainly essential to the judgment there: the validity of the agency's approach to the Act's contingency measures requirements "was at the very heart" of the request for relief in *Sierra Club* and was "fully litigated; in fact, resolved." *Associated Recovery L.L.C. v. Does 1-44*, 769 F. App'x 160, 162 (5th Cir. 2019).

Further, Petitioners in this case were parties in *Sierra Club*, where the contingency measures issue was raised and Petitioners had full opportunity to brief

---

[4] While *Santopadre* focuses on questions of fact, the analysis applies equivalently to questions of law. *See, e.g.*, *B&B Hardware*, 575 U.S. at 148 (quoting Restatement (Second) of Judgments § 27, p.250 (1980)).

the issue. It is irrelevant that Petitioners chose not to discuss contingency measures in their *Sierra Club* brief. Parties are "just as much bound by collateral estoppel as though [they] had presented a barrel of testimony," so long as they had the full opportunity to litigate the issue. *Santopadre*, 937 F.2d at 274 (citations omitted)). Sierra Club briefed the contingency measures issue before Texas filed its response; Texas thus had full opportunity to litigate the contingency measures issue at the time. *See* Final Opening Brief of Petitioners 50-54, *Sierra Club*, 21 F.4th 815 (No. 15-1465), 2020 WL 104119. Nor can Petitioners escape *Sierra Club*'s preclusive effect because no parties challenged that decision. *See, e.g.*, *B&B Hardware*, 575 U.S. at 152. Petitioners' argument that EPA may approve contingency measures that have already started operating before being triggered is flatly contradicted by *Sierra Club*'s holding on that same issue, and Petitioners are bound by *Sierra Club*: "if federal law provides a single standard, parties cannot escape preclusion simply by litigating anew in tribunals that apply that one standard differently." *B&B Hardware*, 575 U.S. at 154; *accord Venetian Casino Resort, L.L.C. v. NLRB*, 484 F.3d 601, 609-10 (D.C. Cir. 2007) (issue preclusion requires denying petition for review on issue that Ninth Circuit already decided).

No exception to issue preclusion applies in this case. Though there may be an exception for "unmixed questions of law" where "unrelated subject matter" is involved or the law has changed, that exception is narrow and does not apply here:

the subject matter is plainly related, if not identical, and the law remains unchanged from when *Sierra Club* was decided. *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-72 (1984); *see Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 397 (5th Cir. 2004) ("In this circuit, collateral estoppel applies to 'pure questions of law' only when there has been no 'change in controlling legal principles.'").

Nor does the "fairness" exception apply here. Courts sometimes consider fairness in applying <u>offensive</u> collateral estoppel, but <u>defensive</u> issue preclusion applies here. *See Kariuki v. Tarango*, 709 F.3d 495, 506 (5th Cir. 2013).

In any event, if fairness were relevant, it would point toward denying the petition under the governing test, which examines whether (1) it was "foreseeable" for Texas that the issue would arise again, (2) Texas previously won any judgments in its favor on the same issue, or (3) Texas has any "procedural opportunities" here not available to it in *Sierra Club*. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979) (identifying three considerations relevant to "fairness"). First, it was eminently foreseeable that this same contingency measures issue would arise again: Petitioners in this matter intervened in *Sierra Club* because they understood the stakes of that case—Texas would be bound by its nationally applicable decision. *See* Unopposed Motion of the State of Texas and the Texas Commission on Environmental Quality for Leave to Intervene as

Respondents 3, *Downwinders at Risk v. EPA*, No. 19-1024 (D.C. Cir. Mar. 6, 2019).[5] Second, Texas was not a party to *LEAN*, the sole prior judgment inconsistent with *Sierra Club*. Third, this case affords no procedural opportunities that were unavailable in *Sierra Club*.

\* \* \*

"[A] losing litigant deserves no rematch after a defeat fairly suffered." *B&B Hardware*, <u>575 U.S. at 147</u> (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, <u>501 U.S. 104, 107</u> (1991)). Public policy "dictates that there be an end of litigation." *Federated Dept. Stores v. Moitie*, <u>452 U.S. 394, 401</u> (1981); *see B&B Hardware*, <u>575 U.S. at 147</u> (issue preclusion protects against repetitive lawsuits, serving interests of judicial economy and "fostering reliance on judicial action by minimizing the possibility of inconsistent decisions" (cleaned up)).

Petitioners had their opportunity to litigate this issue in *Sierra Club*. They lost. They now turn to this Court to relitigate that final and valid judgment. Their petition should be denied.

---

[5] The D.C. Circuit subsequently consolidated *Downwinders* with *Sierra Club*. Order, *Sierra Club*, No. 15-1465 (D.C. Cir. Mar. 21, 2019). The petition in which Texas intervened—*Downwinders*—was the petition where the contingency measures requirement was at issue. *See Sierra Club*, <u>21 F.4th at 818</u> (detailing procedural history).

## II.    THIS COURT SHOULD UPHOLD EPA'S FINAL RULE.

On the merits, there is no dispute that the measures Texas submitted as contingency measures are already-implemented measures that *Sierra Club* held cannot be contingency measures. Neither Petitioners nor Amici contend *Sierra Club* wrongly held that the Act unambiguously prohibits the use of already-implemented measures as contingency measures.[6] *See, e.g.*, Pet. 31 (arguing only that *Sierra Club* does not "overrule" *LEAN*), 38 (arguing only that in this case "a more flexible interpretation of the Act is warranted" than the interpretation *Sierra Club* adopted); Br. of Amici Curiae ("Amici") 10-11 (arguing only that *LEAN* held the opposite), 16-18 (claiming *Sierra Club* somehow does not apply to EPA in this case). Perhaps they eschew that contention because they recognize *Sierra Club* correctly interpreted the Act and *LEAN* did not. Rather than dispute that the correct statutory interpretation is indeed correct, Petitioners and Amici rely on arguments that lead them to untenable conclusions under the rule of law, like that EPA need not obey court holdings or that the very same statutory provision can mean different things in (purportedly) different settings.

---

[6] EPA also does not dispute *Sierra Club*, though it does not say it views the Act as unambiguous. Rather, EPA embraces (at 18-34) as the agency's new interpretation *Sierra Club*'s interpretation, calling it the "best" interpretation of the Act, regardless of whatever degree of deference EPA's new statutory interpretation might be entitled to.

As explained below because it is central to correctly resolving this case—though hardly, if at all, in dispute—the Act unambiguously bars already-implemented contingency measures. This Court can and should adopt that correct interpretation. It should not adopt or endorse Petitioners' position that EPA can defy courts, or any of the other meritless arguments Petitioners and Amici advance.

## A.   The Act unambiguously bars already-implemented contingency measures.

### 1.   The Act's plain text requires future-facing and conditional contingency measures.

The Act requires implementation plans for moderate and higher areas to "provide for the implementation of specific measures <u>to be undertaken</u> if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date," with these measures included in a state's implementation plan "as <u>contingency</u> measures <u>to take effect in any such case</u>" automatically. <u>42 U.S.C. § 7502(c)(9)</u> (emphasis added);[7] *accord id*. § 7511a(c)(9) (requiring serious and higher areas' plans to "provide for the implementation of specific measures <u>to be undertaken</u> if the area fails to meet any applicable milestone" with these measures included in a state's implementation

---

[7] The Act expressly exempts marginal areas from contingency measures. <u>42 U.S.C. § 7511a(a)</u>.

plan "as <u>contingency</u> measures <u>to take effect without further action by the State or Administrator upon a failure</u> by the State to meet the applicable milestone" (emphasis added)). This statutory language is unambiguously future-facing and conditional: as the Ninth Circuit held, "contingency" unambiguously "means 'a possible future event or condition or an unforeseen occurrence that may necessitate special measures.'" *Bahr*, <u>836 F.3d at 1235</u> (quoting *Webster's Third New International Dictionary* (2002)); *accord Sierra Club*, <u>21 F.4th at 828</u> (defining "contingent" as "'dependent on or conditioned by something else'").

Further, the Act requires these "contingency measures" "to be undertaken if" an area fails to make required pollution reductions, "to take effect in" certain situations, and "to take effect…upon" a specific event's occurring. <u>42 U.S.C. §§ 7502(c)(9)</u>, <u>7511a(c)(9)</u>. All these phrases signify that the measures are to start in the event that certain conditions obtain. "A measure 'to be undertaken if' certain standards are not met is, by definition, a measure not yet implemented." *Sierra Club*, <u>21 F.4th at 828</u> (citing *State Farm Fire & Casualty Co. v. United States ex rel. Rigsby*, <u>137 S. Ct. 436, 443</u> (2016) (explaining that "if" and "unless" are "clear[] conditional words"); and *Dodd v. United States*, <u>545 U.S. 353, 358</u> (2005) (explaining that the word "if" "impose[d] a condition on the applicability of [a] subsection" and citing the dictionary definition of the word, which was "in the event that" or "on condition that" (internal quotation marks omitted))

(parentheticals are direct quotations)); *see also United States v. Flores*, <u>664 F. App'x 395, 399</u> (5th Cir. 2016) ("'[I]f' is widely understood to introduce a conditional clause, which is a clause that 'state[s] a condition or action necessary for the truth or occurrence of the main statement of a sentence.'"). "'Contingency measures' that are 'to take effect upon' failure to satisfy standards are…not measures that have been implemented before such failure occurs." *Sierra Club*, <u>21 F.4th at 828</u>; *see also Utility Air Regulatory Grp. v. EPA*, <u>573 U.S. 302, 312</u> (2014) (EPA promulgated rule "to take effect" in future).

Based on this clear language, the D.C. Circuit correctly held the "Act's plain text expressly provides that valid contingency measures become operative only when the triggering conditions set forth in the statute occur, and not any earlier." *Sierra Club*, <u>21 F.4th at 827</u>; *see also* EPA's Resp. Br. ("Resp.") 29-32 (arguing this clear language provides the "best interpretation" of the Act). Notably, too, this plain reading aligns with the Act's structure. *Cf.* Resp. 33-34 (explaining how following Act's plain language accords with Act's "policy goals"). The Act requires (**A**) attainment as expeditiously as practicable, with "<u>reasonably available control</u> measures" to be implemented "as expeditiously as practicable," <u>42 U.S.C. §§ 7502(c)(1)</u> (emphasis added), 7511(a)(1), and (**B**) "<u>contingency</u> measures" "to be undertaken if the area fails to" satisfy certain requirements, *id.* §§ 7502(c)(9), 7511a(c)(9) (emphasis added). Allowing contingency measures to be already-

implemented measures improperly collapses the separate requirements into one, draining meaning from Congress's carefully constructed regulatory scheme.[8] *See, e.g.*, *United States v. Taylor*, <u>142 S. Ct. 2015, 2023-24</u> (2022) (rejecting statutory interpretation for "collapsing the distinction between" two statutory provisions, and thus "defy[ing] our usual rules of statutory interpretation").

Measures that have already been implemented—like the measures Texas submitted here—do not fit within the Act's unambiguous statutory meaning. They are not measures that are to be implemented if a condition comes to pass. They are instead just measures that, in conjunction with others, failed to bring the area to make reasonable further progress toward attainment or, as occurred here, to timely attain.

### 2. The Act's statutory history confirms that EPA had to disapprove already-implemented contingency measures.

The Act's historical development further supports that it unambiguously bars already-implemented contingency measures. Congress passed the 1990 Amendments to fill gaps in clean air attainment and enforcement. The Amendments made the Act more stringent, including adding the contingency measures requirement, and constrained EPA's discretion in order to increase the

---

[8] If an area implements a contingency measure early, it simply then must develop replacement measures. *See* Resp. 34.

Act's efficacy at ensuring necessary pollution reductions actually occurred. *See Whitman*, <u>531 U.S. at 484-85</u>; *see also* 1 A Legislative History of the Clean Air Act Amendments of 1990, at 789 (1993) (statement of Sen. Mitchell[9]) ("One of the problems that has plagued the Clean Air Act is the 'gaming' that has continued in the form of paper trails starting everywhere and leading to no emissions reductions."). Congress thus enacted a well-articulated scheme to address ozone. <u>42 U.S.C. §§ 7511-7511f</u>; *South Coast*, <u>472 F.3d at 887</u> ("[n]o longer willing to rely upon EPA's exercise of discretion," Congress adopted "more comprehensive regulation of…ozone"). Yet here, Texas argues that Congress somehow left EPA discretion to require no immediate catch-up emission reductions for states that missed attainment deadlines. That argument conflicts with the discretion-limiting, "comprehensive regulation" of ozone Congress enacted in the 1990 Amendments, thereby reinforcing that Texas's argument is wrong. *South Coast*, <u>472 F.3d at 887</u>.

### 3. This Court should overrule *LEAN*.

Rather than engage with the Act's plain text and history, Texas relies on *LEAN*, <u>382 F.3d 575</u>. *E.g.*, Pet. 31. EPA explains (at 20-23, 25, 27) how its rationale for the Final Rule remains consistent with *LEAN*. But it is indisputable

---

[9] Senator Mitchell was majority leader at the time and a key proponent of the 1990 Amendments.

that *LEAN* conflicts with both *Sierra Club* and *Bahr*. *See, e.g.*, *Sierra Club*, 21 F.4th at 828 (disagreeing with *LEAN*); *Bahr*, 836 F.3d at 1235 (same). And, as explained below, *LEAN* also conflicts with this Circuit's own precedent. Accordingly, because *LEAN* is both wrongly decided and conflicts with authoritative, correct precedent of multiple circuits, including this one, this Court should overrule *LEAN*. *Cf.* Fed. R. App. P. 35(a), (b)(1) (highlighting importance of "secur[ing] or maintain[ing] uniformity of the court's decisions" and addressing "conflicts with the authoritative decisions of other United States Courts of Appeals that have addressed the issue").

As explained above, the Act unambiguously bars already-implemented measures like those Texas submitted from being contingency measures. *LEAN* wrongly finds the Act ambiguous on that question. 382 F.3d at 583. *Contra Sierra Club*, 21 F.4th at 827-28; *Bahr*, 836 F.3d at 1235-37. But the *LEAN* Court itself acknowledged that "a plain reading" of the Act "would seemingly preclude the use of past reductions which have already failed to achieve attainment" 382 F.3d at 583. That should have been "the end of the matter." *Chevron*, 467 U.S. at 842. Yet *LEAN* finds the Act "silen[t]" and thus ambiguous regarding whether "past reductions which have already failed to achieve attainment" but are "continuing emissions reductions" can be contingency measures. 382 F.3d at 583 (emphasis removed). *LEAN* errs here. "[P]ast reductions which have failed to achieve

attainment" include <u>all</u> such past reductions, regardless of whether the Act expressly lists all possible categories of such reductions. *Id.* Congress is not silent on an issue simply because it does not expressly prohibit an approach that contradicts the Act's text. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, <u>414 U.S. 453, 458</u> (1974) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.").

    *LEAN*'s interpretive approach is wrong under at least three Circuit's precedent, including this Circuit's. This Court has repeatedly rejected "presum[ing] that a power is delegated if Congress does not <u>expressly</u> withhold it." *Contender Farm, L.L.P. v. USDA*, <u>779 F.3d 258, 269</u> (5th Cir. 2015) (emphasis added). Such a "nothing-equals-something argument is barred by [this Court's] precedent…. 'Were courts to presume a delegation of power absent an express withholding of such power'…'agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.'" *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Service*, <u>968 F.3d 454, 460-61</u> (5th Cir. 2020) (citations omitted). By finding ambiguity because Congress did not expressly say already-implemented controls with continuing emission reductions cannot be contingency measures, <u>382 F.3d at 583</u>, *LEAN* demands more than *Chevron* requires and runs counter to Fifth Circuit precedent.

*LEAN*'s interpretive approach further conflicts with the Ninth Circuit's and D.C. Circuit's. The D.C. Circuit has a well-developed line of cases that is fully consistent with this Circuit's holdings in *Contender Farm* and *Gulf Fishermens* on statutory interpretation and thus inconsistent with *LEAN*.[10] In *Bahr*, the Ninth Circuit expressly disagreed with *LEAN*'s interpretive rubric. 836 F.3d at 1236 ("We cannot agree with the Fifth Circuit's interpretative approach.").

Regardless of whether the interpretation *LEAN* upheld is not controlling here, *see, e.g.*, Resp. 20-22, 27 (so arguing), *LEAN* merits overturning under the Federal Rules of Appellate Procedure, *see* Fed. R. App. P. 35(a)-(b), and this Court may do so without going en banc. Panels of this Court have overturned decisions by other panels by circulating the portion of the decision that overrules the prior precedent to the full court. *See, e.g.*, *Affholder, Inc. v. Southern Rock, Inc.*, 746 F.2d 305, 311 (5th Cir. 1984); *Dornbusch v. CIR*, 860 F.2d 611, 612 n.1 (5th Cir. 1988). Numerous other Circuits have also employed this approach to overrule an erroneous panel decision without going en banc. *See, e.g.*, *Gallagher v. Wilton Enterprises*, 962 F.2d 120, 124 n.4 (1st Cir. 1992); *Shipping Corp. of India. v.*

---

[10] *E.g.*, *Sierra Club*, 21 F.4th at 828; *NRDC v. EPA*, 749 F.3d 1055, 1064 (D.C. Cir. 2014) (Kavanaugh, J.); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995); *Railway Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc). This Circuit has already embraced several of these cases in *Contender Farm*, *Gulf Fishermens*, and associated cases.

*Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 (2d Cir. 2009); *Lauderdale-El v. Indiana Parole Bd.*, 35 F.4th 572, 577 n.1 (7th Cir. 2022); *Irons v. Diamond*, 670 F.2d 265, 268 n.11 (D.C. Cir. 1981). This Court should take a similar approach here.

### B. Under the rule of law, EPA must comply with *Sierra Club* and its own regulations.

EPA must comply with applicable court rulings. As the D.C. Circuit has explained, "the Administrator cannot defy a controlling federal court decision in any EPA region that falls within that court's jurisdiction": it is fundamental that "the law requires…obedience to controlling court decisions." *NEDACAP II*, 891 F.3d at 1048, 1050; *see Students for Fair Admissions*, 37 F.4th at 1087 ("[A] court's judgment binds…the parties to a suit."). Here, as explained below, to comply with all applicable rulings, EPA had to follow *Sierra Club*, whereas Petitioners' arguments would require lawless action.

Because the D.C. Circuit was reviewing a nationally applicable rule, its ruling that contingency measures cannot consist of already-implemented measures thus applies to EPA nationally. *NEDACAP II*, 891 F.3d at 1048, 1050; *see* 40 C.F.R. § 56.3(d) (D.C. Circuit decisions reviewing "challenges to 'nationally applicable regulations…' shall apply uniformly"); 85 FR 23,700, 23,719/1 (Apr. 28, 2020) ("[I]f there were a directly controlling decision of the U.S. Court of Appeals for the D.C. Circuit, Region 4 would be bound by such a decision

31

pursuant to 40 C.F.R. 56.3(d)."), *remanded on other grounds by Sierra Club v. EPA*, No. 20-1229 (D.C. Cir. Dec. 17, 2021). EPA thus was obligated to disapprove Texas's submissions of contingency measures that conflict with the Act, as *Sierra Club* properly interpreted it nationally.

Petitioners and Amici have no good response to *Sierra Club*'s scope. For their part, Petitioners entirely ignore *Sierra Club*'s binding effect on the agency. Amici try (at 16-17) to pretend it away with a highly formalistic view of what *Sierra Club* actually means, claiming that for procedural reasons it only affects contingency measures under the 2015 ozone standard. Yet their argument both defies fundamental statutory interpretation principles and is inconsistent with their argument regarding *LEAN*.

First, the statutory command for contingency measures covers <u>all</u> standards for ozone and other pollutants: it does not mean different things for different standards. *See* <u>42 U.S.C. §§ 7502(c)(9)</u>, <u>7511a(c)(9)</u>; *Helix Energy Solutions Group v. Hewitt*, <u>143 S. Ct. 677, 689</u> (2023) (statutory provision "cannot change meanings depending on" its application, but "must mean the same thing in either context"); *Clark v. Martinez*, <u>543 U.S. 371, 386</u> (2005) (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases"). Accordingly, EPA could not lawfully apply one interpretation of

the statutory contingency measures requirement for one ozone standard, but apply a different one for another, as Amici's argument would require.

Second, if Amici's argument were correct, then *LEAN* would itself be distinguishable. That case was decided in 2004—before the 2008 ozone standard was even proposed—and addressed only implementation of the 1979 standard. *LEAN*, 382 F.3d 579 & n.1. Amici cannot have it both ways: if *Sierra Club* could be so easily distinguished, so can *LEAN*.

Just as EPA must follow *Sierra Club*, EPA must also comply with *LEAN*, and it does so in the Final Rule. EPA describes how its disapproval of Texas's submissions complies with *LEAN*'s statement that the Act is ambiguous on the question of contingency measures. Resp. 20-22, 27. EPA's argument is consistent with its statements in the Final Rule, as EPA explains. *See id.* 25. EPA explained its "actions, including this rulemaking, must comport with applicable caselaw," and that caselaw necessarily includes *LEAN*. 88 FR 67,959/3. Nowhere in the Final Rule does EPA say the Act is unambiguous. And, contrary to Amici's claims (at 4, 6-7, 11, 22), which Texas did not make, *LEAN* does not suggest the interpretation to which it deferred was somehow the best interpretation—just that it was "persuasive" under *Skidmore*. *LEAN*, 382 F.3d at 583-84; *see United States v. Mead Corp.*, 533 U.S. 218, 239 (2001) (Scalia, J., dissenting) (distinguishing between *Skidmore* deference and court "giv[ing] the statute what it considered the

best interpretation"). The agency accordingly follows *LEAN* by promulgating a new interpretation of the Act's language that qualifies for deference, displacing its prior interpretation that the *LEAN* Court deferred to. Resp. 20-34.

If this Court finds the pathway EPA followed for complying with *LEAN* to be unavailable or potentially unavailable, the simplest approach for this Court to ensure EPA—and itself—can continue to follow the rule of law is for it to overrule *LEAN*.[11] As explained above, *LEAN* is wrongly decided and conflicts with this Circuit's and at least two other Circuits' binding precedent.

### C. Petitioners' other arguments are meritless.

Petitioners claim (at 19-20, 23-25, 32-33) that EPA's disapproval of Texas's SIP occurred without the required notice and that it would be impossible for them to promulgate legal contingency measures. Both arguments fall flat.

As discussed above, Petitioners were parties to *Sierra Club* and were thus immediately notified of the D.C. Circuit's decision in that case. *See* Resp. 36 (same). They neglect to mention their involvement, instead arguing they had no

---

[11] To the extent EPA has authority to balance conflicting applicable judicial precedent, it would do so reasonably by following the D.C. Circuit's decision. Both the Act and EPA's own regulations direct the agency to prioritize national consistency, particularly in response to judicial decisions like *Sierra Club*. *See* 42 U.S.C. §§ 7601(a)(2), 7607(b)(1); 40 C.F.R. § 56.3; *see also Kennecott Corp. v. EPA*, 684 F.2d 1014 n.18 (D.C. Cir. 1982) (EPA's establishment of a uniform national test "is consistent with th[e] mandate" of § 7601(a)(2)).

notice that EPA would require prospective and conditional contingency measures in Texas. Pet. 23-27. Yet EPA details the steps the agency took after *Sierra Club* to indicate how it was changing its treatment of contingency measures, all of which Texas was privy to. Resp. 16-17. Petitioners cannot plausibly claim they could not "identify, with 'ascertainable certainty,'" the standard EPA would apply in the Final Rule. *Knapp v. USDA*, 796 F.3d 445, 457 (5th Cir. 2015) (citing *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)).

Petitioners wrongly claim (at 23) support for their notice argument from their alleged reliance on EPA's prior interpretation when preparing the SIP submissions at issue here. Such reliance is unavailing. Petitioners essentially ask this Court to hold EPA acted unlawfully or arbitrarily by not rewriting the Act after EPA was bound by court judgment. But EPA has no such authority because Petitioners' submissions were still pending before EPA when *Sierra Club* was issued, and a judicial ruling determining what a statute means "must be read to hold that its rule should apply retroactively to the litigants then before the Court": it "is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate…announcement of the rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97-98 (1993) (cleaned up); *see George v.*

*McDonough*, <u>596 U.S. 740, 751</u> (2022) (describing how this rule applies in agency setting); *EME Homer City Generation v. EPA*, <u>795 F.3d 118, 133</u> (D.C. Cir. 2015) (Kavanaugh, J.) (for EPA's use, "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction"). Obeying binding law after it is announced may not always be easy, but it is hardly inequitable. *See Reynoldsville Casket Co. v. Hyde*, <u>514 U.S. 749, 753-54</u> (1995) (generic "reliance" is insufficient to overcome *Harper*). Accordingly, contrary to Texas's claim (at 24), the Final Rule worked no "unfair surprise," and Texas cannot escape its obligations by claiming lack of notice. *Knapp*, <u>796 F.3d at 458</u>.

Petitioners also seek to escape their obligations by wrongly painting their legal requirement to identify contingency measures that have not already been implemented as a "seemingly impossible task" because the original attainment date has passed. Pet. 5, 19-20. There is no issue of impossibility in this case. EPA has asked only that Texas implement contingency measures that comply with the Act as quickly as possible. Resp. 44-46. Acting quickly is both consistent with the Act's structure and important here to make up for some of the historic shortfalls in pollution reduction. The Act's ozone implementation provisions emphasize accountability for states that fail to attain timely, with contingency measures playing a key role. *See supra* pp.26-27. Further, despite passage of the initial

deadline, Texas can create measures that will generate the overdue additional emission reductions that contingency measures are supposed to deliver. Those emission reductions are needed to bring relief to Dallas and Houston area residents from dangerous ozone levels that have persisted well beyond legal deadlines.

Petitioners' plea (at 18, 30) for a special exemption from the Act's requirements that apply in every other circumstance is thus inconsistent with the facts, caselaw, and the Act. Texas has failed to meet its obligations under the Act, and now faces the consequences of doing so. Its petition should be denied.

## III. WERE IT APPROPRIATE TO GRANT RELIEF, THE FINAL RULE SHOULD BE REMANDED WITHOUT VACATUR.

EPA's action should be upheld. But if this Court were to find relief appropriate, it should remand the Final Rule without vacatur. "Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 239 (5th Cir. 2007) (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.")). Remand without vacatur is appropriate "where 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would

be 'disruptive.'" *Central & S.W. Services v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (citations omitted). Both elements are met here.

If this Court were to decide that EPA's disapproval of Texas's contingency measures was arbitrary and capricious, there would be a serious possibility that EPA would be able to substantiate its decision. EPA could provide additional information to justify its decision that Texas must implement different contingency measures. *See, e.g.*, *id.* If this Court were to find a notice issue, EPA could likely remedy that by going through a new notice and comment period.

Vacatur of the Final Rule would also be disruptive. First, it would further harm residents of the Houston and Dallas areas who have been exposed to illegal levels of ozone pollution for years. Second, it would create national inconsistency in the implementation of contingency measures, leaving industry to navigate disparate requirements and forcing people living in the United States to have different levels of protection from ozone pollution depending on where they live.

The equities, which federal courts have broad discretion to consider in fashioning remedies that are consistent with Congress's enacted policy judgments, point toward protecting Texas's residents from additional harmful ozone pollutants and maintaining national consistency. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496-98 (2001). Several of this Court's sister circuits have considered equities when deciding on a remedy for an agency's action. *See,*

*e.g.*, *Black Warrior Riverkeeper v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015) ("[t]he decision whether to vacate agency action falls within our broad equitable discretion," and court "may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action"); *see also Sierra Club v. EPA*, 60 F.4th 1008, 1023 (6th Cir. 2023) (vacatur of EPA SIP action inappropriate given, among other factors, "the overall equities of the situation"). Residents of the Houston and Dallas areas continue to face some of the worst ozone air pollution in the country. *See, e.g.*, American Lung Association, State of the Air 2024, Most Polluted Cities, https://www.lung.org/research/sota/city-rankings/most-polluted-cities. Texas should not be permitted to escape contingency measures requirements, thereby weakening protections Congress required for its residents, by seeking special treatment from this Court. If relief were deemed appropriate, EPA's Final Rule should be remanded without vacatur.

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Dated: April 29, 2024     Respectfully submitted,

*/s/ Seth L. Johnson*
Seth L. Johnson
Molly Prothero
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 770-3974
sjohnson@earthjustice.org
mprothero@earthjustice.org

*Counsel for Sierra Club*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with <u>Federal Rules of Appellate Procedure 32(a)(7)(B)(i)</u> and (g)(1), that the foregoing **Intervenor-Respondent Sierra Club's Brief**, contains 8,627 words, as counted by counsel's word processing system, and thus complies with the 13,000-word limit.

Further, this document complies with the typeface and type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> & <u>(a)(6)</u> because this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2016** using **size 14 Times New Roman** font.

Dated: April 29, 2024

<i>/s/ Seth L. Johnson</i><br>Seth L. Johnson

**CERTIFICATIONS UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) required privacy redactions have been made, <u>5th Cir. R. 25.2.13</u>; (2) the electronic submission is an exact copy of the paper document, <u>5th Cir. R.25.2.1</u>; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: April 29, 2024

<i>/s/ Seth L. Johnson</i><br>Seth L. Johnson